[No. F034780. Fifth Dist. Aug. 30, 2000.]

SONORA DIAMOND CORP., Petitioner, v.
THE SUPERIOR COURT OF TUOLUMNE COUNTY, Respondent;
SONORA UNION HIGH SCHOOL DISTRICT, Real Party in Interest.

524

Counsel

Carlsmith Ball; Albert H. Ebright; and Priscilla I. Davis for Petitioner.

No appearance for Respondent.

Bergman, Wedner & Dacey, Inc., Gregory M. Bergman, Richard V. Godino and Daphne M. Humphreys for Real Party in Interest.

Opinion

## DIBIASO, Acting P. J.—

### INTRODUCTION

Real Party in Interest Sonora Union High School District (District) sued Sonora Mining Corp. (Sonora Mining) and petitioner Sonora Diamond Corp. (Diamond) for breach of contract. Diamond moved for an order quashing service of process on the ground the trial court was without personal jurisdiction over Diamond. The District's position that jurisdiction existed relied upon three independent grounds—alter ego, agency (including the representative services doctrine) and availment. Ultimately, the trial court denied Diamond's motion. In this opinion, we explore the nature of, and compare, the three jurisdictional theories advanced by the District and apply each to the record evidence. We will grant the petition and order appropriate relief.

### STATEMENT OF THE CASE

On June 29, 1998, the District filed an action in Tuolumne County Superior Court for breach of a real estate sales contract. Named as defendants were Diamond, a Canadian corporation,[1] and Sonora Mining, a Nevada corporation doing business in California. Sonora Mining is a wholly owned subsidiary of Diamond. Diamond was not a signatory to the contract, but the complaint alleged that Sonora Mining was the alter ego of Diamond and therefore that Diamond was liable on the contract. On June 30, 1998, Sonora Mining filed its answer, consisting of a general denial and two affirmative defenses.

---

[1]Diamond was formerly known as Sonora Gold Corp. The name was changed in 1997, when the corporation shifted its business pursuit from gold mining to diamond mining. Until September 1996, Diamond's principal investment was its interest in Sonora Mining. Since September 1996, Diamond's principal investment has been a diamond mine in South Africa.

On January 11, 1999, Diamond filed a motion to quash service of process, asserting the trial court did not have personal jurisdiction over Diamond. The District opposed the motion, arguing in part that jurisdiction over Diamond existed because Sonora Mining was the alter ego of Diamond and because Diamond exercised such control over the mining operations conducted on the subject property as to make Sonora Mining the agent or instrumentality of Diamond.

On October 21, 1999, the trial court granted Diamond's motion to quash, finding that the District had failed to prove Sonora Mining was the alter ego of Diamond and that Diamond had insufficient minimum contacts with California to support personal jurisdiction.

The District thereafter brought a motion for reconsideration, arguing that the trial court had erroneously found certain declarations, allegedly containing evidence favorable to the District, inadmissible because they lacked signatures. The District's moving papers established that the problem with the declarations was the result of a court clerk's error.

On December 10, 1999, the trial court granted the motion for reconsideration and vacated its previous order. After reevaluating all the evidence (including the previously rejected declarations) and hearing further argument by counsel for the parties, the trial court denied Diamond's motion to quash, finding that Sonora Mining was an instrumentality of Diamond in California.

On January 19, 2000, Diamond filed a petition for writ of mandate with this court seeking extraordinary review (Code Civ. Proc., § 418.10, subd. (c)) of the trial court's order. We issued an order to show cause.

STATEMENT OF FACTS

*Sonora Mining and Diamond*

Sonora Mining, a Nevada corporation, was formed in 1983. On August 14, 1984, Sonora Mining entered into the contract by which Sonora Mining bought the real property from the District. The property, valued at $900,000 and located in the Jamestown area of Tuolumne County, was the site of a gold mining operation (the Jamestown Mine). As consideration for the property, the contract provided for an exchange and an endowment. Under the exchange, Sonora Mining agreed to pay the District $2 million; under the endowment, Sonora Mining agreed to pay the District $4 million over a period of 20 years, with minimum payments of $200,000 yearly. The endowment payments were due in November of each year, beginning in 1985.

When the District negotiated for the sale of the property, it knew that Sonora Mining was a wholly owned subsidiary of Diamond and was aware that final approval of the contract made by Sonora Mining was to come from another person or entity. In addition, although the District initially asked that the purchase be secured by a deed of trust on the property and that interest be paid on the unpaid balance of the endowment, the District instead agreed to accept a $2 per ounce royalty on the gold production.

The operation of the mine required the acquisition of vehicles, equipment, supplies, services and various licenses and permits from the controlling governmental agencies. Sonora Mining filed annual tax returns, both federal and state. Proceeds from the sale of gold extracted from the mine were paid to Sonora Mining and deposited in its Toronto bank account. Sonora Mining had separate bank accounts and its own board of directors, but some of Sonora Mining's directors and officers were also directors and officers of Diamond. Sonora Mining also held annual corporate meetings and maintained its own corporate books. The employees at the mine were employed by Sonora Mining, which offered these workers a whole panoply of employment benefits.

The mine was operational until July 1994, at which time the ore reserves were depleted and operations ceased. Sonora Mining failed to make the November 1997 endowment payment due under the contract or, apparently, any further payments. During the life of the mine, Sonora Mining lost $52.5 million. The mine was not profitable because the price of gold was not as forecasted, the amount of gold per ton of rock extracted was less than expected, and the operating costs were higher than expected.

*Relationship Between Sonora Mining and Pathfinder*

In 1985, in order to raise operating capital, Sonora Mining sold a 30 percent interest in the mine to Pathfinder, a Delaware corporation, and formed, with Pathfinder, the Jamestown Mine Joint Venture, a California partnership. The stated purpose of the joint venture was to allow Pathfinder to participate with Sonora Mining in the further exploration, evaluation, development and mining of the mineral resources of the Jamestown Mine. Pathfinder contributed $20 million to the joint venture in exchange for the 30 percent interest in the mine. Sonora Mining contributed all its interest in the mine and the mining operation, as well as the property, to the joint venture, in exchange for a 70 percent interest in the joint venture. Sonora Mining's endowment obligation to the District was noted in the initial accounting attached to the joint venture agreement and transferred to the joint venture under the terms of the agreement. Diamond was not a party to the joint venture.

After its formation and through October 1997, the joint venture made the endowment payments to the District each year. Between 1985 and 1996, Sonora Mining and the joint venture together paid the District a total of $2.6 million under the endowment.

Although in the joint venture agreement Sonora Mining was appointed operator of the mine with day-to-day management responsibility, the operating decisions were made by a five-person operating committee, of which three members were appointed by Sonora Mining and two were appointed by Pathfinder. Action required approval by at least four members. No representative of Diamond sat on the committee.

At the outset, the joint venture did not retain any of the proceeds of the mine operations to cover operating costs. Instead, all the gold produced by the mine was processed into gold bars and distributed to the two joint venturers in accord with their respective percentage interests in the joint venture. To fund the mine's operations, the joint venture provided for monthly cash calls to the two partners, again according to their pro rata partnership shares. The funds thus raised were paid into an account owned by the joint venture and designated the "COR" account. In addition to this COR account, the joint venture maintained three operating accounts. When any one of these operating accounts required an infusion of funds, the necessary amount was transferred from the COR account.

At some point, the revenue generated by selling its share of the gold became inadequate to meet the cash calls to Sonora Mining for operating funds. Thereafter, the joint venturers agreed that the joint venture would itself market the gold production to generate operating income and the proceeds would be credited to Sonora Mining in satisfaction of its pro rata share of operating costs. However, because Sonora Mining's operating costs exceeded the mine's production, Sonora Mining was dependent on the cash contribution it received from Pathfinder and the loans it received from Diamond.

In 1993, Diamond purchased all the stock of Pathfinder's parent corporation, Minecorp, Inc.

*Relationship with Diamond*

Diamond was formed in May 1983, just shortly before the purchase of the property, as a Canadian corporation, for the purpose of acquiring and developing the Jamestown Mine. Its stock is publicly traded. Until December 1998, its corporate offices were located in the Province of Ontario,

Canada. On January 1, 1999, Diamond became a Bermuda corporation and relocated its corporate offices to Hamilton, Bermuda.

Until 1996, the primary business of Diamond consisted of its ownership of all the stock of Sonora Mining. Diamond formed Sonora Mining to ease its ability to do business in California. It provided pre-operation loans to Sonora Mining, which served to pay Sonora Mining's start-up costs.

Both Diamond and Sonora Mining were part of a group of related companies known initially as ABM Gold and later as North West Gold. However, Sonora Mining's only significant source of income was the sale of gold produced by the Jamestown Mine.

Diamond has its own directors and officers. Its board of directors meet quarterly. These meetings are separate from those held by the directors of Sonora Mining, although both are often held in Canada. There is and has been an overlap of individuals serving as directors and officers of both companies.

The annual reports prepared by Diamond are consolidated reports for both Diamond and its subsidiaries, including Sonora Mining. The reports include statements such as "[Diamond] is a Canadian gold mining company which holds 70% interest in and is the operator of the Jamestown mine, the third largest gold mine in the state of California" and "[Diamond] is the operating partner and holds a 70% interest in a joint venture which operates the Jamestown Mine in Tuolumne County, California." In its 1993 annual report, Diamond reported that it owned 100 percent of the Jamestown Mine, the third largest gold mine in the State of California.

Diamond issues its own financial reports and has its own bank accounts. It files the required reports with the Securities Exchange Commission and the Canadian equivalent. Diamond did not commingle its funds with Sonora Mining, although it did loan Sonora Mining approximately $45 million for the operation of the Jamestown Mine, which remains unpaid.[2] The loans were unsecured and not memorialized in any document. No interest was charged. The loans did appear, however, on each company's books as an intercompany loan.

Sonora Mining's books were maintained, during at least part of the time, by Dennis Downey, who was vice-president and corporate secretary of Diamond. Dennis Downey was employed by Diamond, not Sonora Mining.

[2]Interestingly, Diamond was in a similar situation with its parent company, North West Gold.

Sonora Mining was not billed for his services. On occasion, other professional services were rendered Sonora Mining but paid for by Diamond. Sonora Mining's records were kept first in the corporate offices of Diamond and North West Gold in Toronto and then were moved to Bermuda when Diamond relocated its corporate offices.

Other financial transactions by Sonora Mining involved Diamond. For example, when Sonora Mining sold certain property near the Jamestown Mine in exchange for a cash payment and a note, the note was later assigned to another corporation, in exchange for a reduction of Sonora Mining's debt to Diamond in an equal amount. Essentially the same thing occurred when Sonora Mining sold certain Nevada property. Neither of these transactions were related to the contract with the District.

In 1986, the Jamestown Mine Joint Venture borrowed $30 million from five French banks and the loans were guaranteed by Diamond and Pathfinder's parent company. Sonora Mining has never paid dividends to Diamond. Transfers from Sonora Mining's COR account to its operating accounts were on occasion ordered by Diamond personnel on Diamond letterhead. Cash calls made to Pathfinder were on occasion written on Diamond letterhead.[3]

Alan Palmiere, who served as Sonora Mining's treasurer and controller in the early years of the mine's operation, stated that Sonora Mining was dependent on the cash contributions made by Pathfinder and the intercompany loans from Diamond because costs of the mining operations exceeded production income.

During the process of closing of the mine, Patrick Downey and Dennis Downey made all Sonora Mining's financial decisions. The corporate board was reduced to a sole director, Patrick Downey, who was president of Sonora Mining and also executive vice-president and chief financial officer of Diamond. Dennis Downey was an employee of Diamond, but handled the financial matters of Sonora Mining during the shutdown. Downey testified he issued checks to pay invoices submitted to Sonora Mining from Sonora Mining's bank account in Toronto and, when needed, transferred money to Sonora Mining from Diamond's account to cover the payments.[4]

---

[3]Ward Popenoe, who was at different times both president and vice-president of Sonora Mining, stated in his declaration that these transfers and cash calls were made by Sonora Mining, not Diamond, despite the use of the Diamond letterhead. It is undisputed that the order to transfer was as a result of a cash call made by the joint venture operating committee or the committee's financial officer at the mine.

[4]Downey, as well as others, testified that all such intercompany loans were appropriately documented.

DISCUSSION

I.

A. *Standard of Review*

■ The applicable standard of appellate review is the familiar substantial evidence rule. Therefore, we are called upon to determine whether the trial court's decision is supported by substantial evidence (*Serafini v. Superior Court* (1998) 68 Cal.App.4th 70, 77 [80 Cal.Rptr.2d 159]; *Wolfe v. City of Alexandria* (1990) 217 Cal.App.3d 541, 546 [265 Cal.Rptr. 881]), and, in doing so, we resolve all conflicts in the relevant evidence "against the appellant and in support of the order" (*Wolfe v. City of Alexandria, supra,* 217 Cal.App.3d at p. 546). If there is no conflict in the relevant evidence, the question is one of law as to which we exercise our independent judgment. (*Serafini v. Superior Court, supra,* 68 Cal.App.4th at p. 77.)

Because the District bore the initial burden to establish the "facts of jurisdiction" (2 Witkin, Cal. Procedure (4th ed. 1996) Jurisdiction, § 211, pp. 775-776) even though Diamond brought the motion to quash, our focus will be upon the substantiality of the District's showing and its legal arguments in the trial court.

B. *Basic Principles of Jurisdiction*

Code of Civil Procedure section 410.10 permits California courts to exercise jurisdiction on any basis not inconsistent with state or federal constitutional principles. The federal constitutional principles governing jurisdiction, represented by the legal shorthand references *minimum contacts, Internat. Shoe,* and *World-Wide Volkswagen* familiar to every law student, are simple to state but difficult to apply. ■ The overarching general rule is that a court may assume jurisdiction over a nonresident defendant where the defendant's "minimum contacts" with the forum state are sufficient to make the maintenance of the action inoffensive to traditional concepts of fair play and substantial justice. (*Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310, 320 [66 S.Ct. 154, 160, 90 L.Ed. 95, 161 A.L.R. 1057].) Thus, minimum contacts exist where the defendant's conduct in or connection with the forum state is such that the defendant should reasonably anticipate being subject to suit in the state (*World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 297 [100 S.Ct. 559, 567, 62 L.Ed.2d 490]); that is, the defendant's contacts with the forum state are substantial, continuous and systematic (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 445 [58 Cal.Rptr.2d 899, 926 P.2d 1085]). "The sufficiency of such

contacts [to support jurisdiction] is a matter of constitutional law on which the Supreme Court of the United States has the final voice. A judgment rendered in the absence of such [contacts] violates the due process clause of the Fourteenth Amendment." (Judicial Council of Cal. com., reprinted at 14 West's Ann. Code Civ. Proc. (1973 ed.) foll. § 410.10, p. 461; see also *Rice Growers Assn. v. First National Bank* (1985) 167 Cal.App.3d 559, 567 [214 Cal.Rptr. 468].) When the defendant is a foreign corporation, the question whether "jurisdiction may be constitutionally exercised depends upon the circumstances of each individual case. . . . [T]he analysis is concerned with weighing the various relevant 'contacts' by the foreign corporation within the state attempting to exercise jurisdiction." (*Empire Steel Corp. v. Superior Court* (1961) 56 Cal.2d 823, 831 [17 Cal.Rptr. 150, 366 P.2d 502] (*Empire Steel*).)

■ The concept of minimum contacts embraces two types of jurisdiction—general and specific. General jurisdiction results where the defendant's contacts with the forum state are so "systematic and so continuous as to make it consistent with traditional notions of fair play and substantial justice to subject the defendant to the jurisdiction of the forum, even where the cause of action is unrelated to the contacts." (*Calvert v. Huckins* (E.D.Cal. 1995) 875 F.Supp. 674, 677 (*Calvert*); see *Helicopteros Nacionales de Colombia v. Hall* (1984) 466 U.S. 408, 414, fn. 9 [104 S.Ct. 1868, 1872, 80 L.Ed.2d 404].) Specific jurisdiction results when the defendant's contacts with the forum state, though not enough to subject the defendant to the general jurisdiction of the forum, are sufficient to subject the defendant to suit in the forum on a cause of action related to or arising out of those contacts. (*AT&T Co. v. Compagnie Bruxelles Lambert* (9th Cir. 1996) 94 F.3d 586, 588 (*AT&T*); *Capizzano v. Walt Disney World Co.* (D.R.I. 1993) 826 F.Supp. 53, 54-55.) *Specific* jurisdiction exists if: (1) the defendant has purposefully availed itself of forum benefits with respect to the matter in controversy; (2) the controversy is related to or arises out of the defendant's contacts with the forum; and (3) the assertion of jurisdiction would comport with fair play and substantial justice. (*Vons Companies, Inc. v. Seabest Foods, Inc., supra,* 14 Cal.4th at pp. 446-447; see also *Helicopteros Nacionales de Colombia, supra,* 466 U.S. at pp. 414-415 [104 S.Ct. at p. 1872]; *Goehring v. Superior Court* (1998) 62 Cal.App.4th 894, 904 [73 Cal.Rptr.2d 105]; *Sher v. Johnson* (9th Cir. 1990) 911 F.2d 1357, 1361.)

## C. *The Parties' Claims*

The District's position in the trial court was that Diamond was subject to suit in Tuolumne County under what we will for convenience characterize as three separate theories—alter ego, agency, and "availment," although neither

party always clearly distinguished among them.[5] In substance, the District argued, as it argues in this court, that the record established the sufficiency of Diamond's minimum contacts with California, under each of these theories, to justify the trial court's assumption of jurisdiction over Diamond for purposes of the underlying action for breach of contract. Diamond claimed in the trial court, as it does on this appeal, that the record does not support jurisdiction over it on any of the grounds advanced by the District.

The trial court concluded that Diamond must defend itself in Tuolumne County because of its relationship with Sonora Mining and the Jamestown Mine Joint Venture and its activities in the context of this relationship. We will arrive at a contrary determination.

We find considerable confusion in the federal and state case law applying, or purporting to apply, one or more of the doctrines of alter ego, agency, and "availment." In many instances, the courts profess to apply one such theory but in fact rely upon evidence or authorities proper to another. An example is *Advance Coating Technology v. LEP Chemical* (S.D.N.Y. 1992) 142 F.R.D. 91, where the court says it is addressing the plaintiffs' alter ego argument but then proceeds to rely upon what seems to be agency principles. Part of the difficulty the courts have had with these concepts might be found in the fact that each theory shares some common elements with one or both of the others. Though we will separately address each of the three theories, and attempt to maintain what we understand to be the substantive distinctions among them, we will not be equally fastidious in citing to case law when a common or analogous element is involved.

## II.

### A. *Alter Ego*

 In the trial court, the District argued it proved Sonora Mining was the alter ego of Diamond and therefore that the corporate identity of Sonora Mining should be disregarded. As a result, the District took the position Sonora Mining's actions and presence in California must be attributed to Diamond, so that in legal effect Diamond was a California corporation engaged in an ongoing California business and subject to the general jurisdiction of the California courts (see *AT&T, supra,* 94 F.3d at p. 591; *Alberto*

---

[5]Diamond contends the District only raised one theory—alter ego—in the trial court. Based upon the papers filed in connection with the motion to quash and the argument made by counsel at the hearings, we are satisfied that all three theories were presented to the trial court, though the grounds are almost indistinguishable given the manner of presentation by the District.

*v. Diversified Group, Inc.* (5th Cir. 1995) 55 F.3d 201, 205; *Wells Fargo & Co. v. Wells Fargo Exp. Co.* (9th Cir. 1977) 556 F.2d 406, 415).[6]

■ Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations. (*Wenban Estate, Inc. v. Hewlett* (1924) 193 Cal. 675, 696 [227 P. 723]; *Communist Party v. 522 Valencia, Inc.* (1995) 35 Cal.App.4th 980, 993 [41 Cal.Rptr.2d 618]; *Robbins v. Blecher* (1997) 52 Cal.App.4th 886, 892 [60 Cal.Rptr.2d 815].) A corporate identity may be disregarded—the "corporate veil" pierced—where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation. (*Roman Catholic Archbishop v. Superior Court* (1971) 15 Cal.App.3d 405, 411 [93 Cal.Rptr. 338].) Under the alter ego doctrine, then, when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners. (*Robbins v. Blecher, supra,* 52 Cal.App.4th at p. 892; *Communist Party v. 522 Valencia, Inc., supra,* 35 Cal.App.4th at pp. 993-994.) The alter ego doctrine prevents individuals or other corporations from misusing the corporate laws by the device of a sham corporate entity formed for the purpose of committing fraud or other misdeeds. (*Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 842 [26 Cal.Rptr. 806].)

■ In California, two conditions must be met before the alter ego doctrine will be invoked. First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone. (*Automotriz etc. De California v. Resnick* (1957) 47 Cal.2d 792, 796 [306 P.2d 1, 63 A.L.R.2d 1042]; *Hennessey's Tavern, Inc. v. American Air Filter Co.* (1988) 204 Cal.App.3d 1351, 1358 [251 Cal.Rptr. 859]; *Alberto v. Diversified Group, Inc., supra,* 55 F.3d at p. 205; *Calvert, supra,* 875 F.Supp. at p. 678.) "Among the factors to be considered in applying the doctrine are commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of

[6]The District maintains that the alter ego theory of jurisdiction is not at issue on this appeal because this was not the ground relied upon by the trial court to deny Diamond's motion. However, whatever the basis for the trial court's decision, the alter ego theory was raised in the trial court and we must therefore address it because we must affirm if the trial court's ruling can be sustained on any ground presented to that court. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 340, pp. 382-383.)

the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other." (*Roman Catholic Archbishop v. Superior Court, supra,* 15 Cal.App.3d at pp. 406, 411; *Associated Vendors, Inc. v. Oakland Meat Co., supra,* 210 Cal.App.2d at pp. 838-839.) Other factors which have been described in the case law include inadequate capitalization, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers. (See *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1285 [31 Cal.Rptr.2d 433]; *Associated Vendors, Inc. v. Oakland Meat Co., supra,* 210 Cal.App.2d at pp. 838-839; *Alberto v. Diversified Group, Inc., supra,* 55 F.3d at p. 205.) No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied. (*Talbot v. Fresno-Pacific Corp.* (1960) 181 Cal.App.2d 425, 432 [5 Cal.Rptr. 361].) Alter ego is an extreme remedy, sparingly used. (*Calvert, supra,* 875 F.Supp. at p. 678.)

Here, at least one of the two essential elements of the alter ego doctrine was not established; there was no evidence of any wrongdoing by either Diamond or Sonora Mining or any evidence of injustice flowing from the recognition of Sonora Mining's separate corporate identity. Without such evidence, the alter ego doctrine cannot be invoked. (*Meadows v. Emett & Chandler* (1950) 99 Cal.App.2d 496, 498 [222 P.2d 145]; *Alberto v. Diversified Group, Inc., supra,* 55 F.3d at p. 205; see also *Tomaselli v. Transamerica Ins. Co., supra,* 25 Cal.App.4th at p. 1285; *Calvert, supra,* 875 F.Supp. at p. 678.)

Misconduct or injustice was not proved by Sonora Mining's apparent inability to meet the balance of its endowment obligation to the District. The alter ego doctrine does not guard every unsatisfied creditor of a corporation but instead affords protection where some conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form. Difficulty in enforcing a judgment or collecting a debt does not satisfy this standard. (*Associated Vendors, Inc. v. Oakland Meat Co., supra,* 210 Cal.App.2d at p. 842; *Alberto v. Diversified Group, Inc., supra,* 55 F.3d at p. 207; *Lowell Staats Min. Co. v. Pioneer Uravan, Inc.* (10th Cir. 1989) 878 F.2d 1259.)

Similarly, misconduct or injustice was not proved by the many advances made by Diamond for the benefit of Sonora Mining because none were shown to have been made with a fraudulent or deceptive intent. (*Lowell Staats Min. Co. v. Pioneer Uravan, Inc., supra,* 878 F.2d at p. 1262.) The parent is not "exposed to liability for the obligations of [the subsidiary] when [the parent] contributes funds to [the subsidiary] for the purpose of assisting [the subsidiary] in meeting its financial obligations and not for the purpose of perpetrating a fraud." (*Id.* at p. 1263.)

As we understand the District's argument, it maintains in part that, because it raised the alter ego doctrine as a substantive issue in its complaint against Diamond, it was not obliged to prove such allegations in order to establish jurisdiction on that ground. The District cites the rule that a motion to quash for lack of personal jurisdiction does not put the merits of the complaint at issue. (*Kroopf v. Guffey* (1986) 183 Cal.App.3d 1351, 1360 [228 Cal.Rptr. 807].)

The District is plainly wrong to the extent it claims the inclusion in a complaint of alter ego allegations automatically gives the trial court jurisdiction over the defendant against whom such allegations are directed. It is correct that a motion to quash for lack of personal jurisdiction does not implicate the merits of the complaint, but the plaintiff, in opposing the defendant's motion to quash, must present evidence to justify a finding that the requisite jurisdictional minimum contacts exist (*Floveyor Internat., Ltd. v. Superior Court* (1997) 59 Cal.App.4th 789, 793 [69 Cal.Rptr.2d 457]; see generally 2 Witkin, Cal. Procedure (4th ed. 1996) Jurisdiction, § 211, pp. 775-776.)[7]

## B. *Agency*

### 1. *Introduction*

The second theory relied upon by the District was agency, based upon the details of the relationship between Sonora Mining and Diamond. Agency may confer general jurisdiction in the forum state over a foreign corporation. (2 Witkin, Cal. Procedure, *supra,* Jurisdiction, § 167, p. 730.)[8] Though we think many courts have failed to distinguish, accurately or at all, between an agency analysis and an alter ego analysis, the two concepts are different and must be evaluated independently. (*Northern Natural Gas Co. v. Superior Court* (1976) 64 Cal.App.3d 983, 994 [134 Cal.Rptr. 850] (*Northern*).)

We start with the firm proposition that neither ownership nor control of a subsidiary corporation by a foreign parent corporation, without more, subjects the parent to the jurisdiction of the state where the subsidiary does business. (*Cannon Mfg. Co. v. Cudahy Co.* (1925) 267 U.S. 333, 336 [45 S.Ct. 250, 251, 69 L.Ed. 634] (*Cannon*); Rest.2d Conf. of Laws, § 52, com. b, pp. 180-181.) "Control" in this context means the degree of direction and oversight normal and expected from the status of ownership; it comprehends

---

[7]The procedure may be different in federal courts. (See *Data Disc, Inc. v. Systems Tech. Assoc., Inc.* (9th Cir. 1977) 557 F.2d 1280, 1285.)

[8]Though the District does not consistently differentiate between the agency approach and the "availment" approach (see *post*), we read the District's arguments as incorporating both grounds as alternate bases for jurisdiction in this case. We treat each separately.

such common characteristics as interlocking directors and officers, consolidated reporting, and shared professional services. (*Rollins Burdick Hunter of So. Cal., Inc. v. Alexander & Alexander Services, Inc.* (1988) 206 Cal.App.3d 1, 9 [253 Cal.Rptr. 338]; *Escude Cruz v. Ortho Pharmaceutical Corp.* (1st Cir. 1980) 619 F.2d 902, 905; *Calvert, supra,* 875 F.Supp. at pp. 678-679; *Clark v. Matsushita Elec. Indus. Co., Ltd.* (M.D.Pa. 1993) 811 F.Supp. 1061, 1067 (*Clark*); *Meyers v. ASICS Corp.* (C.D.Cal. 1989) 711 F.Supp. 1001.) The relationship of owner to owned contemplates a close financial connection between parent and subsidiary and a certain degree of direction and management exercised by the former over the latter. (*Rollins Burdick Hunter of So. Cal., Inc. v. Alexander & Alexander Services, Inc., supra,* 206 Cal.App.3d at p. 9; *Calvert, supra,* 875 F.Supp. at pp. 678-679.)

However, the case law identifies one situation when the acts of the parent may be found to trespass the boundaries of legitimate ownership and control of the subsidiary and expose the parent to the power of the state in which the subsidiary does business. Thus, where the nature and extent of the control exercised over the subsidiary by the parent is so pervasive and continual that the subsidiary may be considered nothing more than an agent or instrumentality of the parent, notwithstanding the maintenance of separate corporate formalities, jurisdiction over the parent may be grounded in the acts of the subsidiary/agent. (*Clark, supra,* 811 F.Supp. 1061, 1067.) In this instance, the question is not whether there exists justification to disregard the subsidiary's corporate identity, the point of the alter ego analysis, but instead whether the degree of control exerted over the subsidiary by the parent is enough to reasonably deem the subsidiary an agent of the parent under traditional agency principles.[9] (*Ibid.*) The jurisdiction acquired by the forum state under this rationale is general. (*Ibid.*)

Control is the key characteristic of the agent/principal relationship. (*Cislaw v. Southland Corp.* (1992) 4 Cal.App.4th 1284, 1292-1296 [6 Cal.Rptr.2d 386].) Accordingly, if a parent corporation exercises such a degree of control over its subsidiary corporation that the subsidiary can legitimately be described as only a means through which the parent acts, or nothing more than an incorporated department of the parent, the subsidiary will be deemed to be the agent of the parent in the forum state and jurisdiction will extend to the parent. (See *Rollins Burdick Hunter of So. Cal., Inc. v. Alexander & Alexander Services, Inc., supra,* 206 Cal.App.3d at p. 9; *Kramer Motors, Inc. v. British Leyland, Ltd.* (9th Cir. 1980) 628 F.2d 1175, 1177; *Escude Cruz v. Ortho Pharmaceutical Corp., supra,* 619 F.2d at p. 905; *Calvert, supra,* 875 F.Supp. 674; *Clark, supra,* 811 F.Supp. at p. 1067; *Gallagher v. Mazda*

---

[9]Obviously, the agency approach does not include, among other factors, the elements of wrongdoing and injustice material to the alter ego doctrine.

*Motors of America, Inc.* (E.D.Pa. 1992) 781 F.Supp. 1079, 1083-1084 (*Gallagher*); *Bellomo v. Pennsylvania Life Co.* (S.D.N.Y. 1980) 488 F.Supp. 744 (*Bellomo*).)

The nature of the control exercised by the parent over the subsidiary necessary to put the subsidiary in an agency relationship with the parent must be over and above that to be expected as an incident of the parent's ownership of the subsidiary and must reflect the parent's purposeful disregard of the subsidiary's independent corporate existence. (See *Rollins Burdick Hunter of So. Cal., Inc. v. Alexander & Alexander Services, Inc., supra,* 206 Cal.App.3d at p. 9.) The parent's general executive control over the subsidiary is not enough; rather there must be a strong showing beyond simply facts evidencing "the broad oversight typically indicated by [the] common ownership and common directorship" present in a normal parent-subsidiary relationship. (*Calvert, supra,* 875 F.Supp. at p. 679; see also *Wells Fargo & Co. v. Wells Fargo Exp. Co., supra,* 556 F.2d at pp. 419-420 and numerous federal cases cited therein.) As a practical matter, the parent must be shown to have moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's *day-to-day* operations in carrying out that policy. (*Calvert, supra,* 875 F.Supp. at p. 679; see also *Rollins Burdick Hunter of So. Cal., Inc. v. Alexander & Alexander Services, Inc., supra,* 206 Cal.App.3d at p. 9; *American Intern. Airways v. Kitty Hawk Group* (E.D.Mich. 1993) 834 F.Supp. 222, 225; *Bellomo, supra,* 488 F.Supp. at p. 745.)

### 2. Analysis

#### a. Representative Services

In practical effect, the District's agency argument boils down to a claim the trial court's assumption of jurisdiction is warranted because Sonora Mining performed what we will term "representative services" for Diamond. In the words of the District, jurisdiction over Diamond attaches because Sonora Mining was "either 'established for, or is engaged in activities that, but for the existence of [Sonora Mining], [Diamond] would have to undertake itself.' "[10] As legal authority for this position, Diamond cites several cases which have found jurisdiction appropriate because the foreign parent corporation permitted the subsidiary to perform acts in the forum state

---

[10]Other statements by the District expressing this same basic rationale are: "Diamond's entire existence is based upon the operations of the Jamestown Mine," "Diamond's ongoing existence is dependent on the Jamestown Mine operation and . . . Diamond has no business purpose apart from such operation," "[N]either Diamond nor [Sonora] Mining had any business other than the Jamestown Mine," and "Diamond utilized [Sonora] Mining as its instrumentality to conduct gold mining operations in California."

that the parent would otherwise have had to perform itself as a part of the parent's expected business operations.[11] (See *Chan, supra,* 39 F.3d at p. 1405; *Gallagher, supra,* 781 F.Supp. at p. 1085; *Bellomo, supra,* 488 F.Supp. at p. 745.)[12] Quoting from an earlier case, the Ninth Circuit in *Chan, supra,* 39 F.3d at page 1405, described the rationale as follows: " '[A] foreign corporation is doing business in [the forum state] . . . when its [forum state] representative provides services beyond 'mere solicitation' and these services are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.' " (*Ibid.*)

The "representative services" doctrine does not apply here to validate the trial court's decision. The doctrine supports the exercise of jurisdiction when the local subsidiary performs a function that is compatible with, and assists the parent in the pursuit of, the parent's *own* business, but the doctrine does not support jurisdiction where the parent is merely a holding company whose only business pursuit is the investment in the subsidiary. The court in *Gallagher, supra,* 781 F.Supp. at page 1085, explained this distinction: "[I]f a parent uses a subsidiary to do what it otherwise would have done itself, it has purposely availed itself of the privilege of doing business in the forum. Jurisdiction over the parent is therefore proper. [Citations.] This contrasts to the case of a holding company. In such a case, the subsidiary is not performing a function that the parent would otherwise have had to perform itself (the holding company could simply hold another type of subsidiary). In such a case, imputing jurisdictional contacts would be improper."[13] (See also *Bellomo, supra,* 488 F.Supp. at p. 746.)

In *Gallagher,* the trial court decided to set a hearing to enable the plaintiff to attempt to "impute the jurisdictional contacts of [the subsidiary] to [the parent]" under the legal standard articulated by the court. (*Gallagher, supra,*

---

[11]Whether this approach is a variant of the agency theory or instead a distinct basis for jurisdiction, of the same ilk as alter ego, is not made clear in the cases. We treat it as a variant of the agency doctrine. (See *Chan v. Society Expeditions, Inc.* (9th Cir. 1994) 39 F.3d 1398, 1405 (*Chan*).)

[12]We read *Mathes v. National Utility Helicopters Ltd.* (1977) 68 Cal.App.3d 182 [137 Cal.Rptr. 104], cited by the District, as being decided on a representative services rationale rather than the alter ego theory expressed by the court. The "injustice" element of the alter ego equation was not mentioned in the opinion, which leads us to question whether it applied that doctrine.

[13]We think the *Gallagher* court's use of the phrase "purposely availed itself" is confusing because it suggests the "representative services" approach is equivalent to the "availment" theory. We do not believe this is so, as we will explain, *post.* For one thing, representative services supports general jurisdiction (*Chan, supra,* 39 F.3d at p. 1405) while availment supports only specific jurisdiction (*Wells Fargo & Co. v. Wells Fargo Exp. Co., supra,* 556 F.2d at p. 420, fn. 14).

781 F.Supp. at pp. 1085-1086.) Unfortunately, *Gallagher* is not helpful beyond its statement of the law because the precise factual circumstances of the relationship between the parent and the subsidiary are not disclosed.

The opinion in *Chan*, where the Ninth Circuit remanded for factual findings by the trial court on the "representative services" issue, is much more instructive about the application of the doctrine because the facts are fleshed out by the court. (*Chan, supra*, 39 F.3d at pp. 1405-1406.) There, the plaintiff sued for damages for personal injury arising out of the capsizing of an inflatable raft operating from a cruise ship near Tahiti. The parent was a German corporation which owned and operated the cruise ship but which had no contacts with the forum state (Washington). The local corporation was in the business of marketing cruises and chartering cruise ships, and was responsible for chartering the cruise ship from which the raft operated. A German citizen was the sole shareholder, chairperson, and president of the local corporation and the president and sole owner of the parent.

Under these circumstances, the Ninth Circuit found that the "representative services" theory might sustain jurisdiction over the parent based upon the activities of the local corporation because the parent "is in the business of operating the [cruise ship], has no other business than the carriage of passengers, and the passengers were obtained, ticketed, and supplied with cabins solely through the efforts of [the local corporation]." (*Chan, supra*, 39 F.3d at p. 1405.)

Also of help in explaining the doctrine is *Bellomo*, though we disagree with its conclusion. In *Bellomo*, the parent was a foreign corporation that wholly owned several subsidiaries and sub-subsidiaries, most of which were in the business of writing and servicing a variety of insurance policies in the forum state and in other states. The parent was "a corporate shell," which did "not conduct business directly, but only through its subsidiaries." (*Bellomo, supra*, 488 F.Supp. at p. 746.) The court's proposed standard "for determining the agency of a holding company subsidiary" postulated that jurisdiction did not exist where the "holding company is nothing more than an investment mechanism" but did exist where the "subsidiaries are created by the parent . . . to carry on business on its behalf [and] there is no basis for distinguishing between the business of the parent and the business of the subsidiaries." (*Ibid.*)

■ Here, unlike the parent in *Chan* which owned and operated the cruise ship, Diamond engaged in no independent business operations, whether connected to mining or not. Like the parent in *Bellomo*, Diamond was a holding company whose business was not mining but rather its

investment in Sonora Mining. Therefore, Sonora Mining was not "performing a function that [Diamond] would otherwise have had to perform itself." (*Gallagher, supra,* 781 F.Supp. at p. 1085.) Had Diamond, for example, owned the rights to the gold and used Sonora Mining as the operating and marketing entity, perhaps general jurisdiction over Diamond would be proper under the representative services rationale, because Diamond in that situation could not reap the benefits of its rights unless it or someone else removed and sold the ore. Neither this circumstance, nor any analogous one, is present in the record of this case. Diamond was not engaged in the mining business and owned nothing but the stock of Sonora Mining. Diamond's business was investment only. (See *Bellomo, supra,* 488 F.Supp. at p. 746.)

It is abstractly true that Diamond could have dispensed with the formation of Sonora Mining and instead acquired the mine itself and hired its own employees to work the mine and market the gold. In this sense, Diamond was using a "subsidiary to do what it otherwise would have done itself." (*Gallagher, supra,* 781 F.Supp. at p. 1085.) However, this is true whenever a foreign holding company elects to invest in a local business operation rather than conduct the operation itself. To find the holding company subject to jurisdiction simply because the holding company chose to invest rather than operate would swallow the distinction, made in the case law and described above, between holding companies and operating companies, as well as implicitly obliterate the federal constitutional principle pronounced by the United States Supreme Court, the authoritative voice on the subject of federal constitutional law, that the parent-subsidiary relationship alone is not a basis for exercising jurisdiction over the parent based upon the activities of the subsidiary. (*Cannon, supra,* 267 U.S. 333, 335-336 [45 S.Ct. 250, 250-251].) If the fact of investment alone were sufficient to invoke jurisdiction because the holding company/parent was using a "subsidiary to do what it otherwise would have done itself" (*Gallagher, supra,* at p. 1085), it would never be necessary for any party plaintiff to resort to alter ego, agency, availment or any other theory to secure jurisdiction over a foreign parent, and one would be left to wonder why the courts have found themselves obliged to spend so much paper and print evaluating these bases of jurisdiction.

We believe the court in *Bellomo* made exactly this mistake. It determined that the parent's status as a mere holding company with no business operations other than the investment in the subsidiaries was sufficient to make out a prima facie case that the subsidiaries were doing business in the forum state as the agents of the parent. (*Bellomo, supra,* 488 F.Supp. at p. 747.) In our humble view, this conclusion violated both the "representative services" doctrine the court itself described and purported to apply, and the rule of *Cannon.*

### b. *Independent Factors*

██ The District appears to argue, alternatively, that even if the evidence is insufficient to establish that Sonora Mining provided representative services for Diamond, the same evidence nevertheless supports the conclusion that Sonora Mining was Diamond's agent. We will now assess each of the many separate factors pointed to by the District, which, though collectively relied upon to support the representative services theory, also seem to be advanced as independent reasons for the assumption of jurisdiction.

### (1) *Formation of and Investment in Sonora Mining*

The District asserts that Diamond and Sonora Mining must be deemed a single integrated enterprise because Diamond formed Sonora Mining to operate in California, Sonora Mining's only investment was the Jamestown Mine, and Sonora Mining's sole purpose was to develop and operate the mine. However, we have already pointed out that a parent corporation's formation and ownership of an independent subsidiary for the purpose of conducting business in the forum state does not itself subject the parent to jurisdiction in that state. (*Cannon, supra,* 267 U.S. 333, 336 [45 S.Ct. 250, 251]; *Sammons Enterprises, Inc. v. Superior Court* (1988) 205 Cal.App.3d 1427, 1434-1435 [253 Cal.Rptr. 261]; *J.M. Sahlein Music Co. v. Nippon Gakki Co., Ltd.* (1987) 197 Cal.App.3d 539, 543 [243 Cal.Rptr. 4].)

Moreover, Sonora Mining was not an empty corporate shell. As the trial court found, Sonora Mining was adequately capitalized at the outset and regularly funded, by intercompany loans, when operational losses made cash infusions necessary. It was formed with the intention of making a profit; that it did not do so was the result of market and production factors, not intentional acts on the part of Diamond calculated to render Sonora Mining insolvent. (See *Alberto v. Diversified Group, Inc., supra,* 55 F.3d at p. 206.)

Additionally, when a new business is formed, its start-up assets must come from somewhere; they do not materialize from nothing. It is not out of the ordinary for the owner of the new venture to contribute its own funds or property, or obligate itself (directly or as a guarantor) for loans from third parties, for these purposes. That is the essence of an investment, the consideration for which is the ownership interest (such as stock) that the contributor/owner receives in return. Therefore, the fact that Diamond was involved in the initial financing of the mine operation was not conduct outside the normal expectations of the parent-subsidiary relationship.

The District also argues that Sonora Mining was Diamond's agent in California because Diamond's sole source of income was derived from the

gold production at Jamestown. However, the District here has the facts wrong; there was no evidence that any income, net or gross, from the mine was paid to or appropriated by Diamond without concern for corporate formalities. Insofar as the record shows, the only benefits Diamond reaped from Sonora Mining's operations were reflected in the value of the stock owned by Diamond, a truism in every instance where the capital stock of an entity is owned by another person or entity.[14] This fact cannot alone justify the exercise of jurisdiction over the stockholder. (See *Escude Cruz v. Ortho Pharmaceutical Corp., supra,* 619 F.2d at p. 905.)

### (2) *Financial Support/Loan Guarantees*

The District next points out that Diamond guaranteed key financial obligations and provided ongoing financial support to Sonora Mining. However, as we explained above, the nature of these acts by Diamond did not go beyond what is normally expected of an owner of the stock of an unprofitable subsidiary corporation. (*AT&T, supra,* 94 F.3d at p. 591 [no jurisdiction over parent even though parent among other things "guaranteed loans for the subsidiary"]; *Alberto v. Diversified Group, Inc., supra,* 55 F.3d at pp. 203-204; *Lowell Staats Min. Co. v. Pioneer Uravan, Inc., supra,* 878 F.2d at p. 1262; *Calvert, supra,* 875 F.Supp. at p. 679.) If such an owner wishes to remain in business in the anticipation of ultimately turning a profit, one option is to use its own assets to make up for the business's inability to generate sufficient revenue to cover all its costs. (See *Alberto, supra,* at p. 207 ["[W]e fail to see that any unfairness or injustice would result by honoring [the subsidiary's] separate corporate existence merely because [the parent's] honored commitment to infuse more than $4 million into [the subsidiary] ultimately proved to be too little and too late to prevent [the subsidiary's] corporate ship from sinking"].) Another is to secure loans to the subsidiary, which likely will require parental guarantees. (See *AT&T, supra,* 94 F.3d at p. 591.) There is no evidence Diamond "stripped" Sonora Mining of its assets. (See *ADO Finance AG v. McDonnell Douglas Corp.* (C.D.Cal. 1996) 931 F.Supp. 711, 718 (*ADO*).)

In this case, all financial transactions between Diamond and Sonora Mining were separately recorded, maintained in the records of each, documented as intercompany loans and similar arrangements, and dealt with as legitimate obligations. The fact that no interest was charged was immaterial; it is not unusual for owners of struggling businesses to infuse, as capital contributions, cash into the business as necessary to pay operating and other essential costs. (*ADO, supra,* 931 F.Supp. at p. 718.) For our purposes, at

---

[14]As it turned out, Diamond did not gain any lasting benefits from the stock ownership for the shares ultimately became valueless.

least, there is no substantial difference between a capital contribution and an interest-free loan, given that Diamond was the sole owner of Sonora Mining.[15]

Although there is evidence that the order to transfer money from the Toronto account to the California COR account in response to cash calls was given at times by Diamond employees on Diamond letterhead, it is undisputed the cash calls were earmarked for operating expenses incurred by the mine and unfunded by production income. There is no evidence Diamond made any decision to call for the transfer or set the amount. The letters requesting transfer clearly reflected that the money paid in answer to a call was to pass from Sonora Mining's corporate account in Toronto to the Sonora Mining COR account in California. There was no evidence of any commingling of funds between Sonora Mining and Diamond.

Moreover, the fact that certain financial assets of Sonora Mining, such as the proceeds of sale of certain of Sonora Mining's Nevada assets, went to reduce Sonora Mining's loan obligations to Diamond does not prove the unity of the two corporations. Indeed, it indicates just the opposite, because the treatment of the transactions acknowledged and maintained the separate corporate identity of the two entities and the legitimacy of Sonora Mining's debts to Diamond. If the use of the assets to satisfy Sonora Mining's pre-existing indebtedness to Diamond operated to the detriment of any creditor of Sonora Mining, such creditor may have had several independent remedies, including those available under the fraudulent transfer statutes. (See Civ. Code, § 3439 et seq.)

It is true that Dennis Downey, the vice-president and corporate secretary of Diamond, kept the books of Sonora Mining and was paid by Diamond for these services without a charge back to Sonora Mining. In addition, on occasion other professional services were rendered to Sonora Mining but paid for by Diamond. However, these incidents, on this evidentiary record, were "attenuated at best" and therefore not a viable basis for the exercise of jurisdiction. (*AT&T, supra,* 94 F.3d at p. 590; see *Calvert, supra,* 875 F.Supp. at p. 678 [provision of professional legal services too insubstantial to warrant general jurisdiction over provider corporation].)

### (3) *Interlocking Officers and Directors*

The District maintains that the existence of common officers and directors between the two corporations supports the trial court's assumption of jurisdiction. The law is otherwise. It is considered a normal attribute of ownership that officers and directors of the parent serve as officers and directors of

---

[15]As a matter of corporate financing, there is obviously a material difference between debt and equity methods of raising funds.

the subsidiary. (*United States v. Bestfoods* (1998) 524 U.S. 51, 69 [118 S.Ct. 1876, 1888, 141 L.Ed.2d 43, 157 A.L.R. Fed. 735]; *AT&T, supra,* 94 F.3d at p. 591; *Calvert, supra,* 875 F.Supp. at p. 678.) " '[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts.' [Citations.] [¶] This recognition that the corporate personalities remain distinct has its corollary in the 'well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do "change hats" to represent the two corporations separately, despite their common ownership. [Citations.]' " (*United States v. Bestfoods, supra,* 524 U.S. at p. 69 [118 S.Ct. at p. 1888].)

Thus, that the directors and officers were interlocking is insufficient to rebut the presumption that each common officer or director wore the appropriate "hat" when making corporate and operational decisions for the respective entities. (*Lowell Staats Min. Co. v. Pioneer Uravan, Inc., supra,* 878 F.2d at p. 1262.)

Neither of the cases cited by the District requires a different result. In *ADO, supra,* 931 F.Supp. at page 718, the shareholders were shown to have managed and controlled all the operations, including the day-to-day affairs, of the local company *without the involvement of the local company's own management.* In *American Intern. Airways v. Kitty Hawk Group, supra,* 834 F.Supp. at page 225, the president of the parent corporation made operational and management decisions for the subsidiary *as president of the parent.*

(4) *Consolidated Financial Reporting/Annual Reports*

The District placed considerable weight upon Diamond's practice of issuing annual reports, including those to shareholders, which combined information pertaining to Diamond with information pertaining to Sonora Mining, even though it was undisputed the respective corporate books and records remained separate.[16] The cases are unanimous that consolidated reporting is standard business practice and will not support jurisdiction in the absence of evidence establishing an agency relationship. (*AT&T, supra,* 94 F.3d at p. 591; *Alberto v. Diversified Group, Inc., supra,* 55 F.3d at p. 207; *Lowell Staats Min. Co. v. Pioneer Uravan, Inc., supra,* 878 F.2d at p. 1263; *Calvert, supra,* 875 F.Supp. at p. 678; *Capizzano v. Walt Disney World Co., supra,* 826 F.Supp. 53; *Clark, supra,* 811 F.Supp. at p. 1069; *Bellomo, supra,* 488 F.Supp. at p. 746; *Advance Coating Technology v. LEP Chemical, supra,*

---

[16]The existence of consolidated reports was, as we read the trial court's decision, the element that "tipp[ed] the scales" in favor of the assumption of jurisdiction.

142 F.R.D. 91.) "[C]onsolidating the activities of a subsidiary into the parent's annual reports is a common business practice. It is allowed by both the Internal Revenue Service and the Securities and Exchange Commission, and it is recommended by generally accepted accounting principles." (*Calvert, supra,* at p. 678-679.) Consequently, the use of "we" or "the Company" or "Diamond" in the several reports in evidence did not prove that Diamond and Sonora Mining were, in actual practice, a single entity.[17]

### (5) *Postoperational Involvement*

Last, the District contends Sonora Mining was the agent of Diamond because of the latter's extensive postoperational involvement in winding up Sonora Mining. The District claims all decisions concerning the termination of operations were made by Diamond, because Patrick Downey was the sole director of Sonora Mining and, at the same time, was the executive vice-president of Diamond and because Dennis Downey's services as a financial officer were utilized even though Dennis Downey was employed by Diamond.

Though we agree that Patrick Downey was a common director and officer who made decisions concerning the shutdown of Sonora Mining, there is no evidence he made such decisions other than in his capacity as president of Sonora Mining and not as executive vice-president of Diamond. Furthermore, utilizing the services of Dennis Downey, an employee of Diamond, to help wrap up the financial aspects of Sonora Mining's demise did not put Sonora Mining under the excessive control of Diamond. Sonora Mining had no income and no source of future income, the mine having played out. Diamond could do nothing other than wrap it up; to do so, the services of a financial professional were required. If Sonora Mining had no assets to pay for such assistance, Diamond, as the owner of Sonora Mining's stock, had to furnish it. In the last analysis, Diamond was in no different position than any other shareholder/owner of a defunct business who must liquidate the remaining assets, pay the outstanding debts, close the books, and file required final governmental reports and returns. To the extent the assets of such a business are not available to defray the costs of these tasks, the owner must pay for them from its own pocket or perform one or more of them itself.

### (6) *Conclusion*

The District appears to claim that, if none of the foregoing factors support the trial court's assumption of jurisdiction over Diamond, all taken together

---

[17]Indeed, in the reports the word "Company" was defined as including both Diamond and Sonora Mining.

do, though it is not clear whether this contention is distinct from the District's reliance upon the representative services principle. In any event, this aggregation of the separate factors cannot support jurisdiction over Diamond. The sum of a series of zeros, no matter how many, is still zero.

c. *Other Factors*

Insofar as the key element of the agency theory—the control of the day-to-day operations of Sonora Mining—is concerned, the record shows that Sonora Mining was responsible for running the mine, and there is no evidence that Diamond directed or participated in the methods or means by which Sonora Mining performed that function. Diamond did not effectively operate the Jamestown Mine, nor does the record show any direct involvement by Diamond in any "on the site" operational decisions. Instead, the joint venture operating committee had the general responsibility—and discharged it—of keeping the Jamestown Mine operational and in production, and Sonora Mining had the responsibility of performing the detailed work necessary to do so. No officials of Diamond were members of the operating committee.

With respect to the period during which Sonora Mining was a going concern, the record shows that sharing of operational employees was not the practice. Sonora Mining for the most part hired its own employees and handled its own record keeping and finances. If Diamond supplied an employee in isolated instances, the event did not amount to a significant contact with California. (See *Calvert, supra,* 875 F.Supp. at p. 678.)

To the extent certain other attributes of the parent-subsidiary relationship are in evidence here they are of a type or nature deemed by the law to be appropriate, normal involvement by a parent corporation with its subsidiary and therefore insufficient alone or in combination to support a finding of agency. These attributes include Diamond's monitoring of Sonora Mining's performance, supervising Sonora Mining's budget decisions, and setting general policies and procedures to be followed by Sonora Mining. (*United States v. Bestfoods, supra,* 524 U.S. at p. 69 [118 S.Ct. at p. 1888]; see *AT&T, supra,* 94 F.3d at p. 591 [no jurisdiction over parent even though parent "guaranteed loans for the subsidiary, reviewed and approved the subsidiary's major decisions, placed several of its own directors on the subsidiary's board, and was closely involved in the subsidiary's pricing decisions"].)

We therefore find nothing in the record which established that the degree of supervision or control exercised by Diamond over Sonora Mining went beyond that usually anticipated in a parent-subsidiary relationship. The

record instead shows that Sonora Mining was, and was maintained as, an independent corporation, doing business in California and held for that purpose by Diamond, and that Diamond acted consistent with the behavior expected of the owner of what turned out to be an unprofitable venture.

## C. Availment

■ The principle of availment arises where it is shown that a specific activity of the parent corporation, while done in the context of the parent-subsidiary relationship, is itself sufficient to justify the exercise of specific jurisdiction over the parent by the forum state. The target activity by the parent corporation must support a finding that the parent has purposefully availed itself of the protection and benefits of the forum state. (*Empire Steel, supra,* 56 Cal.2d at p. 829; *Firemans' Fund Ins. National Bank* (9th Cir. 1996) 103 F.3d 888, 894; *Caruth v. International Psychoanalytical Ass'n* (9th Cir. 1995) 59 F.3d 126.)

Because jurisdiction on this ground is specific rather than general, the acts furnishing the basis for jurisdiction must be related to the cause of action for which jurisdiction is sought. (*Pope v. National Aero Finance Co.* (1963) 220 Cal.App.2d 709, 719 [33 Cal.Rptr. 889]; *Wells Fargo & Co. v. Wells Fargo Exp. Co., supra,* 556 F.2d at p. 420, fn. 14; *Meyers v. ASICS Corp., supra,* 711 F.Supp. 1001.) The question in this situation is not whether justification exists to disregard the subsidiary's corporate existence or whether the subsidiary is an agent of the parent but rather whether the parent for all intents and purposes has done an act in the. forum state of a nature as to make reasonable the forum state's exercise of jurisdiction over the parent with respect to that act and its consequences. Thus, some actions of the parent corporation, even though occurring in the context of the parent-subsidiary relationship, will support jurisdiction over the parent because the acts constitute a purposeful availment by the parent of the benefits and protections of the forum state. (*AT&T, supra,* 94 F.3d at p. 590.) The critical acts may be taken directly by the parent or indirectly through the subsidiary, but in all events must be attributable to the parent corporation itself. Thus, the theory does not rest on a finding that the subsidiary is a sham corporation or an agent or representative of the parent. Rather, the focus is on the acts of the parent itself. This is a fine distinction between availment, agency and alter ego as bases for jurisdiction, and is often not explained in the cases.

The concept has been a part of California law for some time. In *Empire Steel, supra,* 56 Cal.2d 823, the Texas parent corporation was not formally doing business in California. It had, for business reasons of its own, decided to expand into California, but chose not to do so through an extension of its

own corporate structure. Instead, it decided to establish a wholly owned subsidiary incorporated in this state. It provided the start-up capital and gave unquestionably invaluable support to the subsidiary as the latter commenced operations in California.

Despite the parent's obvious volitional choice to enter the California market through a subsidiary, the Supreme Court made it clear this alone was not enough to give California jurisdiction over the Texas corporation. (*Empire Steel, supra,* 56 Cal.2d. at p. 832.) Nor did the court apply the alter ego doctrine to determine whether the subsidiary's corporate form should be disregarded. Instead, the court found jurisdiction existed because the parent had engaged in certain acts, related to the cause of action brought by the plaintiff and within the context of the parent's relationship with the subsidiary, which themselves constituted sufficient minimum contacts of the parent with California for jurisdiction to attach. (*Ibid.*)

In particular, the record showed that the parent corporation in *Empire* continued to fund the subsidiary when the subsidiary was otherwise financially insolvent and, despite knowing the subsidiary's financial condition, caused the subsidiary to enter into a contract with an unsuspecting third party. The court concluded that these actions *by the parent* led the unsuspecting third party creditor to believe the subsidiary was a financially viable entity even though it was not. (*Empire Steel, supra,* 56 Cal.2d at p. 832.) The contract in issue was negotiated and signed by the subsidiary corporation, but the agreement was the result of activity directly attributable to the parent corporation. The act which conferred jurisdiction was an independent act of the parent, knowingly creating the misleading perception to the third party, that the subsidiary was financially solvent. (*Id.* at p. 835.)

This court recognized the doctrine in *Northern, supra,* 64 Cal.App.3d at page 994, citing 6 Witkin, Summary of California Law (8th ed. 1974) Corporations, section 11, page 4323, a case cited by the District.[18] In *Northern,* reiterating the rule that a parent corporation cannot be subject to jurisdiction solely by the fact that the subsidiary is wholly owned by the parent, we found jurisdiction did not exist as to one parent, Northern Natural Gas. (*Northern, supra,* at p. 991.) Because we found no exception to the uniform principle that corporate entities are considered separate and distinct for jurisdictional purposes in the absence of sufficient contrary evidence, we

---

[18]Although the District relies upon *Empire* and *Northern* to support its position that Sonora Mining was an instrumentality or agent of Diamond, these cases do not address the concepts of agency and general jurisdiction. They instead involve the assumption of specific jurisdiction based upon discrete acts of the parent in the forum state which are related to or give rise to the cause of action for which jurisdiction is sought.

decided the trial court had no jurisdiction over Northern. However, we agreed jurisdiction existed over the second parent, Propane Gas, because of its own independent acts, taken in the context of the parent-subsidiary relationship, of forming a joint venture in California. (*Id.* at p. 994.)

 Several acts by Diamond are claimed by the District to constitute a purposeful availment by Diamond itself of the benefits and protections of California. We need not address each separately. Many, such as interlocking directors and officers, consolidated financial statements, and postoperational acts, have also been advanced by the District to support its argument that Sonora Mining was the agent of Diamond. None of these factors support jurisdiction over Diamond on the basis of agency, and they likewise do not support jurisdiction over Diamond on the basis of availment.

In addition, there is simply no proof here of the sine qua non of jurisdiction founded upon availment—the connection of the cause of action sued upon with the acts supporting the exercise of jurisdiction. Specifically, financial legerdemain by a parent with respect to a subsidiary will support jurisdiction under the "availment" doctrine only if the parent's acts are connected or related to the cause of action on which jurisdiction is sought, the nature of the jurisdiction being specific to the lawsuit. (*Pope v. National Aero Finance Co., supra,* 220 Cal.App.2d at p. 719 [It is not enough that a foreign corporation engage in an activity which can be considered a substantial contact; the contact must be claim related.].) This occurs, for example, if the parent's actions lead to a false representation by the parent to third parties that the subsidiary is solvent when it is not, as was the case in *Empire Steel,* or if the parent enters into a contract or partnership with a California entity on the subsidiary's behalf, as in *Northern.*

The required nexus is not proved here. Diamond was not a signatory to the contract with the District, there is no proof that Sonora Mining was inadequately capitalized or in financial trouble at the time the agreement was entered into (the trial court in fact found to the contrary), and Diamond did not guarantee the agreement between Sonora Mining and the District. The actions of Diamond with respect to other financial transactions involving Sonora Mining, even if it is assumed such actions constituted purposeful "availment" (which they did not), cannot provide the basis of specific jurisdiction in this dispute based upon the endowment aspect of the contract. (*Wells Fargo & Co. v. Wells Fargo Exp. Co., supra,* 556 F.2d at p. 420, fn. 14; see also *Empire Steel, supra,* 56 Cal.2d 823.) The apparent inability of Sonora Mining to pay off the endowment was due to market and economic factors, not any purposeful actions of Diamond or its representatives.

Finally, the fact that Diamond provided the services of Dennis Downey and the fact that Patrick Downey was solely responsible for winding up

Sonora Mining has nothing to do with the endowment contract that forms the basis of the instant action, and therefore such facts cannot provide the basis for specific jurisdiction over Diamond for purposes of the lawsuit.

## IV.

### Conclusion

Because the showing made by the District in the trial court does not demonstrate "facts of jurisdiction" (2 Witkin, Cal. Procedure, *supra,* Jurisdiction, § 211, pp. 775-776) under any of the legal theories advanced by the District, the trial court erred in denying Diamond's motion to quash service. Without proof of the requisite minimum contacts, the arm of the California courts is not long enough to reach Diamond.[19]

### DISPOSITION

The petition is granted. Let a peremptory writ of mandate issue commanding the Tuolumne County Superior Court to vacate its order, filed on December 10, 1999, in case No. 45407, denying the motion of Sonora Diamond Corp. to quash service of process and to enter an appropriate order granting the motion. Costs in this original proceeding are awarded to petitioner.

Buckley, J., and Gildner, J.,* concurred.

---

[19]After our initial review of the record, it appeared to us that Diamond had purchased Pathfinder's 30 percent interest in the joint venture. Ownership of a partnership interest in the forum state may provide a basis for jurisdiction over the partner, especially where the partnership agreement provides that California law will apply. (See *Goehring v. Superior Court, supra,* 62 Cal.App.4th at pp. 904-905.) We requested supplemental briefing on the point. After considering the parties' respective supplemental submittals, we have concluded that our initial impression was erroneous. In reality, Diamond purchased the *stock* of Pathfinder from its parent company, Minecorp, Inc., but at no time did Diamond become a partner in the joint venture. Given these facts, and the fact that the District makes no claim or effort to show that Diamond's dealings with respect to Pathfinder or its interest in the joint venture provides a basis for the assumption of jurisdiction over Diamond, we find no reason to further consider the subject.

*Judge of the Kern Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.