Filed 5/25/16  Gardner v. Lifehouse Health Services CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| DARYL GARDNER et al., | C078332 |
| Plaintiffs and Appellants, | (Super. Ct. No. 160932) |
| v. | |
| LIFEHOUSE HEALTH SERVICES, LLC, et al., | |
| Defendants and Respondents. | |

In this elder abuse case, plaintiffs Daryl and Max Gardner contend the trial court erred in sustaining the demurrers of defendants Lifehouse Health Services, LLC, and Lifehouse Holdings, LLC, without leave to amend.  We agree and therefore reverse.

FACTUAL AND PROCEDURAL BACKGROUND

We take the following facts from the first amended complaint:

Cypress Healthcare Center (Cypress) is a 24-hour health facility in Butte County.  Defendant Lifehouse Cypress Operations, LLC, (Cypress Operations) does business as Cypress.  Cypress Operations is wholly owned and controlled by defendant Lifehouse

1

Health Services, LLC, (Lifehouse Health) -- which we take to mean that Lifehouse Health is the sole member-manager of Cypress Operations. In turn, Lifehouse Health is wholly owned and controlled by defendant Lifehouse Holdings, LLC, (Lifehouse Holdings) -- which we take to mean that Lifehouse Holdings is the sole member-manager of Lifehouse Health. (We will refer to all three defendants jointly as defendants.)

Maxine Gardner had been a resident at Cypress since at least 2009. After a choking episode in June 2010, Maxine's plan of care provided that she was to receive " 'cuing' " and " 'verbal reminders' " regarding certain precautions she needed to take while eating to prevent another choking episode. Despite this plan, Maxine, who took all her meals in her room, was consistently and repeatedly not supervised while she ate. In December 2011, following an unsupervised dinner, Maxine died after she was found not breathing and with no pulse and with large quantities of food in her mouth and upper airway.

In June 2014, Maxine's sons, Daryl and Max, for themselves and as Maxine's successors in interest,[1] filed the first amended complaint in this action against Cypress Operations, Lifehouse Health, and Lifehouse Holdings, alleging four causes of action arising from Maxine's stay at Cypress and her resulting death, two of which were directed only at Cypress Operations. The two causes of action directed at Lifehouse Health and Lifehouse Holdings (and also Cypress Operations) were for violation of the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15600 et seq.) (the Elder Abuse Act) and wrongful death. Both causes of action were based on allegations that defendants (1) were Maxine's "custodial care providers during the time [she] was a resident at [Cypress]"; (2) as such, "were responsible for protecting [her] from health and safety hazards, for providing [her] with medical care and treatment for

---

[1] We will refer to Daryl and Max Gardner jointly as the Gardners.

2

her physical and mental health needs, and for carrying out the orders of [her] physicians"; and (3) "withheld services and subjected [Maxine] to neglect . . . by failing to protect [her] from health and safety hazards, failing to provide her with medical care for her physical and mental health needs, and failing to carry out dietary orders, as set forth herein, and, as a result, caused [her] to suffer serious physical and emotional injuries, including death."  The first amended complaint also included a boilerplate allegation that "[a]t all times herein mentioned and in doing the things herein alleged, each of the defendants . . . acted as the agents . . . of each of their co-defendants . . . ."

In July 2014, Lifehouse Health and Lifehouse Holdings each filed a demurrer.[2] As relevant here, in support of their demurrers, Lifehouse Health and Lifehouse Holdings argued (among other things) that the Gardners had failed to state facts sufficient to hold them directly liable; or to hold them liable under the alter ego doctrine; or to hold them vicariously liable under an agency theory.

In October 2014, the trial court sustained the demurrers of Lifehouse Health and Lifehouse Holdings without leave to amend.  From the resulting judgment of dismissal, the Gardners timely appealed.

DISCUSSION

I

*Standard Of Review*

"On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, the standard of review is well settled.  The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded.  [Citations.]  The court does not, however, assume the

---

[2]  Cypress Operations also filed a demurrer, which the trial court sustained in part and overruled in part.  As the case against Cypress Operations was not terminated by the trial court's ruling, that part of the case is not before us.

3

truth of contentions, deductions or conclusions of law. [Citation.] The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken.' " (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967.)

## II

### *Applicable Law*

As will become apparent hereafter, resolution of the issues in this case depends in significant part on application of the statutes governing limited liability companies. In presenting their arguments, the parties have referred exclusively to those statutes currently in effect, which are part of the California Revised Uniform Limited Liability Company Act (Corp. Code, § 17701.01 et seq.) (the Revised Act). But the Revised Act did not become operative until January 1, 2014 (Corp. Code, § 17713.13) -- years *after* the events at issue here (which culminated in Maxine's death in December 2011), and the Revised Act is clear that it does not apply retroactively. (See Corp. Code, § 17713.03 ["This title does not affect an action commenced, proceeding brought, or right accrued or accruing before this title takes effect"]; § 17713.04, subd. (b) ["Except as otherwise specified in this title, this title applies only to the acts or transactions by a limited liability company or by the members or managers of the limited liability company occurring . . . on or after January 1, 2014. The prior law governs all acts or transactions by a limited liability company or by the members or managers of the limited liability company occurring . . . prior to [January 1, 2014]"].) Accordingly, this action is governed not by the Revised Act, but by its predecessor -- the Beverly-Killea Limited Liability Company Act (former Corp. Code, § 17000 et seq.) (the Act).

## III

### *Agency Liability*

On appeal, the Gardners contend the facts alleged in the first amended complaint support holding Lifehouse Health and Lifehouse Holdings vicariously liable for the acts of Cypress Operations based on an agency theory pursuant to the reasoning of *Sonora*

4

*Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 539 (*Sonora Diamond*) and directly liable as the actual perpetrators of elder abuse.**3** We begin with the Gardners' claim of agency liability.

*Sonora Diamond* involved (among other things) the question of whether the California courts had jurisdiction over an out-of-state parent corporation (Sonora Diamond) because of the degree of control that corporation exercised over its subsidiary (Sonora Mining), which operated a gold mine within the state. (*Sonora Diamond*, *supra*, 83 Cal.App.4th at pp. 530-534, 540-552.) The appellate court explained that "[a]gency may confer general jurisdiction in the forum state over a foreign corporation," but "neither ownership nor control of a subsidiary corporation by a foreign parent corporation, without more, subjects the parent to the jurisdiction of the state where the subsidiary does business." (*Id.* at p. 540.) The court went on to explain as follows:

" 'Control' in this context means the degree of direction and oversight normal and expected from the status of ownership; it comprehends such common characteristics as interlocking directors and officers, consolidated reporting, and shared professional services. [Citations.] The relationship of owner to owned contemplates a close financial connection between parent and subsidiary and a certain degree of direction and management exercised by the former over the latter. [Citations.]

"However, the case law identifies one situation when the acts of the parent may be found to trespass the boundaries of legitimate ownership and control of the subsidiary and expose the parent to the power of the state in which the subsidiary does business. Thus, where the nature and extent of the control exercised over the subsidiary by the

---

**3** In their briefs, the Gardners also contended Lifehouse Health and Lifehouse Holdings could be held liable under an alter ego theory, but before oral argument the Gardners expressly conceded "that the complaint fails to allege facts supporting application of the alter ego doctrine" and conceded that it could not be amended to do so. Accordingly, we need not address the alter ego theory of liability.

parent is so pervasive and continual that the subsidiary may be considered nothing more than an agent or instrumentality of the parent, notwithstanding the maintenance of separate corporate formalities, jurisdiction over the parent may be grounded in the acts of the subsidiary/agent. [Citation.] In this instance, the question is not whether there exists justification to disregard the subsidiary's corporate identity, the point of the alter ego analysis, but instead whether the degree of control exerted over the subsidiary by the parent is enough to reasonably deem the subsidiary an agent of the parent under traditional agency principles. [Citation.] The jurisdiction acquired by the forum state under this rationale is general. [Citation.]

"Control is the key characteristic of the agent/principal relationship. [Citation.] Accordingly, if a parent corporation exercises such a degree of control over its subsidiary corporation that the subsidiary can legitimately be described as only a means through which the parent acts, or nothing more than an incorporated department of the parent, the subsidiary will be deemed to be the agent of the parent in the forum state and jurisdiction will extend to the parent. [Citations.]

"The nature of the control exercised by the parent over the subsidiary necessary to put the subsidiary in an agency relationship with the parent must be over and above that to be expected as an incident of the parent's ownership of the subsidiary and must reflect the parent's purposeful disregard of the subsidiary's independent corporate existence. [Citation.] The parent's general executive control over the subsidiary is not enough; rather there must be a strong showing beyond simply facts evidencing 'the broad oversight typically indicated by [the] common ownership and common directorship' present in a normal parent-subsidiary relationship. [Citations.] As a practical matter, the parent must be shown to have moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's *day-to-day* operations in carrying out that policy." (*Sonora Diamond*, *supra*, 83 Cal.App.4th at pp. 540-542, fn. omitted.)

6

Here, the Gardners contend they alleged sufficient facts to establish agency liability because they alleged that Lifehouse Holdings owns and controls Lifehouse Health and that Lifehouse Health owns and controls Cypress Operations, and they alleged that each defendant is the agent of the other defendants. Regardless of whether their argument might have carried the day if defendants were, in fact, corporations, their argument *cannot* carry the day given that defendants are limited liability companies, because that different status makes all the difference. Essentially, *Sonora Diamond* rests on the principle that agency is established when the parent corporation "trespass[es] the boundaries of legitimate ownership and control of the subsidiary" corporation and, despite observing corporate formalities, "in effect take[s] over performance of the subsidiary's *day-to-day* operations." (*Sonora Diamond*, *supra*, 83 Cal.App.4th at pp. 541-542.) Under the Act, however, a member-manager did not trespass the boundaries of legitimate ownership and control of a limited liability company by taking over performance of the company's day-to-day operations. Under the Act, unless the articles of organization included a statement that the limited liability company was to be managed by one or more managers and not by all its members, "every member [wa]s an agent of the limited liability company for the purpose of its business or affairs, and the act of any member, including, but not limited to, the execution in the name of the limited liability company of any instrument, for the apparent purpose of carrying on in the usual way the business or affairs of the limited liability company of which that person [wa]s a member, binds the limited liability company in the particular matter, unless the member so acting ha[d], in fact, no authority to act for the limited liability company in the particular matter and the person with whom the member is dealing ha[d] actual knowledge of the fact that the member has no such authority."[4] (Former Corp. Code,

---

[4] The law remains the same in this regard under the Revised Act. (See Corp. Code, § 17703.01, subd. (a).)

7

§§ 17151, subd. (b), 17157, subd. (a).) Thus, it was entirely appropriate under the Act for a member-manager to manage the day-to-day operations of the limited liability company of which that person or entity was a member, and in doing so the member-manager did not make the company its agent; instead, the Act expressly provided that the member-manager was the agent and the company the principal, and not the other way around. If we were to accept the Gardners' argument that agency liability could be imposed here under the reasoning of *Sonora Diamond*, we would turn the statutory scheme for limited liability companies on its head, which we are not entitled to do. By controlling the operation of Cypress Operations, Lifehouse Health did what it was entitled to do as the member-manager of Cypress Operations, and by controlling the operation of Lifehouse Health, Lifehouse Holdings did what it was entitled to do as the member-manager of Lifehouse Health. Contrary to the Gardners' argument, under these circumstances no agency relationship was created that would make the member-manager vicariously liable for the wrongful acts of the limited liability company. Accordingly, the trial court did not err in concluding that the Gardners failed to state sufficient facts to establish liability on the part of Lifehouse Health and Lifehouse Holdings under agency principles.

IV

*Direct Liability*

Next, the Gardners contend their first amended complaint alleged facts that support the direct liability of Lifehouse Health and Lifehouse Holdings as perpetrators of elder abuse. They contend that both of these entities had care or custody of Maxine and/or were care custodians of Maxine -- along with Cypress Operations -- and therefore can be held liable coextensively with Cypress Operations. This time, we agree.

As we have noted, the first amended complaint alleges that defendants (1) were Maxine's "custodial care providers during the time [she] was a resident at [Cypress]"; (2) as such, "were responsible for protecting [her] from health and safety hazards, for providing [her] with medical care and treatment for her physical and mental health needs,

8

and for carrying out the orders of [her] physicians"; and (3) "withheld services and subjected [Maxine] to neglect . . . by failing to protect [her] from health and safety hazards, failing to provide her with medical care for her physical and mental health needs, and failing to carry out dietary orders, as set forth herein, and, as a result, caused [her] to suffer serious physical and emotional injuries, including death."

On their face, these allegations appear sufficient to provide a basis for direct liability on the part of Lifehouse Health and Lifehouse Holdings for what happened to Maxine. Lifehouse Health and Lifehouse Holdings argue, however, that these allegations are *not* sufficient for several reasons. We address those arguments in turn.

A

*Statutory Limitations On Liability*

In arguing that the Gardners have not adequately alleged a basis for holding them directly liable for what happened to Maxine, Lifehouse Health and Lifehouse Holdings first argue that "the sole allegation . . . that appears to be directed specifically against [Lifehouse Health] is that [Lifehouse Health] 'consciously refused to provide adequate and qualified staffing to protect [Maxine] from [choking] risks.' " In their view, such an action -- undertaken by Lifehouse Health in its role as the sole member-manager of Cypress Operations -- is precisely the sort of action a member-manager is supposed to take, but the Act "protects the member-manager from liability" for such acts.

Lifehouse Health and Lifehouse Holdings are mistaken for two reasons. First, the Gardners' complaint is not limited to alleging that Lifehouse Health refused to provide adequate staffing in its role as the member-manager of Cypress Operations. Rather, as we have shown, the complaint alleges, far more broadly, various failures by Lifehouse Health (and the other two defendants) while acting as Maxine's custodial care provider. Although the complaint also alleges (effectively) that Lifehouse Health was the sole member-manager of Cypress Operations, and that Lifehouse Holdings was the sole member-manager of Lifehouse Health, the complaint does not specifically allege that the

9

liability of either entity depends solely and exclusively on actions taken in those roles. Thus, the factual premise for this argument does not withstand scrutiny.

Second, the *legal* premise for this argument also does not withstand scrutiny. Essentially, Lifehouse Health and Lifehouse Holdings suggest that the Act protected a member-manager from liability for any action taken as a member-manager because the Act provided that no member or manager would be personally liable for any liability of the limited liability company "solely by reason of being" a member or a manager of the limited liability company. (Former Corp. Code, §§ 17101, subd. (a) [member], 17158, subd. (a) [manager].)[5] Yet the Act also provided that nothing in the relevant section of the Act was to "be construed to affect the liability of a member of a limited liability company . . . to third parties for the member's participation in tortious conduct." (Former Corp. Code, § 17101, subd. (c).) And case law construed the limitation on liability for managers similarly. Specifically, the court in *People v. Pacific Landmark, LLC* (2005) 129 Cal.App.4th 1203 held that "whereas managers of limited liability companies may not be held liable for the wrongful conduct of the companies *merely* because of the managers' status, they may nonetheless be held accountable under [former] Corporations Code section 17158, subdivision (a) for their personal participation in tortious or criminal conduct, even when performing their duties as manager." (*Pacific Landmark, LLC*, at p. 1213.) Thus, even if the Gardners *had* limited the allegations in their complaint against Lifehouse Health to its actions taken as the member-manager of Cypress Operations, the Act would not have cloaked Lifehouse Health with statutory protection from liability.

Lifehouse Health and Lifehouse Holdings contend that under *Pacific Landmark*, liability for personal participation in tortious conduct "does not apply merely because a

---

[5] A substantially similar provision appears in the Revised Act. (See Corp. Code, § 17703.04, subd. (a)(2).)

member has 'perform[ed] a general administrative duty' " (quoting *People v. Pacific Landmark, LLC*, *supra*, 129 Cal.App.4th at p. 1215), and they suggest this rule applies here because the Gardners' "opening brief does not identify a single allegation in the [first amended complaint] that [Lifehouse Health], as an entity distinct from Cypress [Operations] -- or [Lifehouse] Holdings, which has no corporate connection to Cypress [Operations] -- participated in [Maxine's] treatment at Cypress." As we have explained, however, the Gardners' complaint *does* allege that Lifehouse Health and Lifehouse Holdings acted, along with Cypress Operations, as Maxine's custodial care providers and in that capacity neglected Maxine's care in various regards. Those allegations are sufficient to allege personal participation in tortious conduct going beyond the mere performance of a general administrative duty. Moreover, it is not for us, particularly at the pleading stage, to say that Lifehouse Health and Lifehouse Holdings could *not* have acted in concert with Cypress Operations in jointly serving as custodial care providers for Maxine. On the contrary, we must treat the demurrers of Lifehouse Health and Lifehouse Holdings as admitting all material facts properly pleaded; thus, we must treat the demurrers as having admitted that they, along with Cypress Operations, were Maxine's custodial care providers during the time she was a resident at Cypress.

B

*Care And Custody*

Irrespective of the statutory limitations on liability in the Act, Lifehouse Health and Lifehouse Holdings contend they cannot be held liable under the Elder Abuse Act because they do not qualify as "health practitioners" or "care custodians" within the meaning of the Elder Abuse Act. They later admit that "liability under the [Elder Abuse] Act can be interpreted to include 'anyone having "care or custody" of an elder,' "[6] but

---

[6]     This is a wise admission, given that the Elder Abuse Act defines "abuse" as including "neglect" (Welf. & Inst. Code, § 15610.07, subd. (a)) and in turn defines

11

they contend the Gardners' "allegations do not show that [Lifehouse Health] or [Lifehouse] Holdings had any care or custody of [Maxine]."

Not so. As we have shown, the Gardners' complaint alleges that all three defendants were Maxine's "custodial care providers during the time [she] was a resident at [Cypress]" and, as such, "were responsible for protecting [her] from health and safety hazards, for providing [her] with medical care and treatment for her physical and mental health needs, and for carrying out the orders of [her] physicians." Thus, the Gardners' complaint *does* allege that Lifehouse Health and Lifehouse Holdings had care *and* custody of Maxine.

C

*Elder Abuse Versus Professional Negligence*

Lifehouse Health and Lifehouse Holdings next contend that the Gardners' allegations "do not state a cause of action under the Elder Abuse Act; at most, the allegations describe professional negligence, which is distinct from elder abuse." They contend that liability under the Elder Abuse Act requires recklessness, and the facts alleged here do not rise to the level of recklessness because the Gardners' allegations "do not describe a fundamental failure to provide medical services."

To the extent Lifehouse Health and Lifehouse Holdings rely on *Worsham v. O'Connor Hospital* (2014) 226 Cal.App.4th 331 for the proposition that a fundamental failure to provide medical services must be shown in a case like this, we disagree. As we have noted, "neglect" within the meaning of the Elder Abuse Act includes "[t]he negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise." (Welf. & Inst. Code, § 15610.57, subd. (a)(1).) And as our Supreme Court has explained,

"neglect" as including "[t]he negligent failure of *any person having the care or custody of* an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise" (*id.*, § 15610.57, subd. (a)(1), italics added).

12

"neglect" within the meaning of the Elder Abuse Act refers to "the failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults . . . to carry out their custodial obligations." (*Delaney v. Baker* (1999) 20 Cal.4th 23, 34.) Here, the Gardners essentially alleged that defendants, as Maxine's custodial care providers, failed to attend to her basic needs because they failed to ensure that she received the supervision they knew she needed during her meals to protect her from the risk of choking on her food. Not only could this failure qualify as "neglect" within the meaning of the Elder Abuse Act, it could also be deemed reckless because defendants failed to provide Maxine with the requisite supervision day-in and day-out for a period of 18 months. Construed in the light most favorable to the Gardners, these facts are sufficient to state a cause of action under the Elder Abuse Act.

D

*Wrongful Death*

Noting that the Gardners styled their wrongful death cause of action as "WRONGFUL DEATH [Elder Abuse]," Lifehouse Health and Lifehouse Holdings argue that "a wrongful death/elder abuse cause of action does not exist under California law." They further note that the Gardners "apparently seek to pursue a claim of wrongful death under the Elder Abuse Act because they believe doing so will avoid a statutory damage limit."

A demurrer is not the proper vehicle for determining the applicability of potential limitations on a claim for damages; the only question before us is whether the Gardners have adequately pled a cause of action for wrongful death. They have -- and Lifehouse Health and Lifehouse Holdings do not argue otherwise. Where "the death of a person [is] caused by the wrongful act or neglect of another," the surviving children of the decedent may bring a cause of action for wrongful death. (Code Civ. Proc., § 377.60.) Here, the Gardners have alleged that Maxine's death was caused by the wrongful acts or neglect of the three defendants. Accordingly, the Gardners have properly stated a cause of action

for wrongful death.  What remedies they may be entitled to on that cause of action is not an issue to be resolved by demurrer.

## DISPOSITION

The judgment is reversed, and the trial court is directed to vacate its order sustaining the demurrers of Lifehouse Health and Lifehouse Holdings and to enter a new order overruling those demurrers.  The Gardners shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(2).)


/s/
Robie, J.



We concur:



/s/
Nicholson, Acting P. J.



/s/
Renner, J.


14