Filed 4/16/25  Landa v. Simmons CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| ENRIQUE LANDA, as Trustee, etc., | D083814 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2022-00004017-CU-BC-NC) |
| JAMES D. SIMMONS et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Cynthia A. Freeland, Judge.  Affirmed.

Kirby & Kirby and Michael L. Kirby for Plaintiff and Appellant.

Deleissegues Law Firm and Richard Deleissegues for Defendants and Respondents.

The DEFA Trust dated June 2, 2003 (DEFA) filed this action by its Trustee, Enrique Landa (Landa), against James Simmons (James)[1] seeking

---

[1]    Because James Simmons and his sons, Matthew Simmons (Matt) and Jason Simmons (Jason) share a common last name, we will refer to them by their first names.  We intend no disrespect.  We refer to James, Matt, and Jason collectively as "the Simmons family."

to collect on secured promissory notes executed by James. It subsequently named James's sons, Matt and Jason, in a first amended complaint, as well as the Diamond Rose LLC (Diamond Rose), Consultants Collaborative, Inc. (Consultants Collaborative), and Dexter Development Group, LLC (Dexter) (collectively, Defendants). DEFA alleged that some of the collateral secured by the promissory notes, or proceeds therefrom, had been improperly transferred to or withheld by these individuals and entities, and that these individuals and entities should be held responsible for assets and income due under the notes. The court entered judgment against James for breach of contract and awarded damages and declaratory relief but otherwise ruled in favor of Defendants on the remaining claims.

On appeal, DEFA contends substantial evidence does not support the court's rulings that the alter ego doctrine did not apply, that Jason and Matt did not make a fraudulent conveyance involving the San Marcos Highlands project, and that Jason and Matt's testimony on some topics was more credible than James's. It further takes issue with the court's ruling that James was not an affiliate of Dexter. Finally, DEFA argues the court erred in construing the note language and granting declaratory relief by limiting the extent and scope of DEFA's security interest in the defined collateral and the proceeds therefrom.

Defendants defend the court's ruling and ask us to sanction DEFA and its attorney for pursuing a frivolous appeal. We affirm the judgment and deny the sanctions request.

FACTUAL AND PROCEDURAL BACKGROUND

A.   *Business Entities*

In 1987, James formed a business with a partner that he renamed Consultants Collaborative, Inc. in 1990. He eventually phased out his

2

partner and developed a strong reputation in the land use planning and real estate development industry. Although Jason and Matt had provided services for Consultants Collaborative as 1099 contract employees in the past, both went on to pursue other business ventures. Consultants Collaborative has not had a bank account since approximately 2014 and ceased operations in about 2015.

James, Matt, Jason, and several other partners executed an operating agreement to form Dexter Development Group, LLC in 2006 to pursue a single-family residential project in the City of San Marcos. However, this version of the LLC was never formed or capitalized.

In 2010, Jason and Matt formed Dexter doing business as CCI. Although Dexter provided land planning services like those Consultants Collaborative had offered, and benefited from its good reputation by using the name CCI, Dexter is not a continuation of Consultants Collaborative or affiliated in any way. Dexter and Consultants Collaborative operated out of the same office space, and Dexter markets itself as a "family business" with decades of experience. Although the brothers briefly made James a member of Dexter in 2011 for tax reasons, they phased out his ownership interest in 2012.

James now works for Dexter as 1099 contractor. However, Jason testified that he and Matt are the only two who decide what projects Dexter will accept and with which clients to contract. After receiving payment from clients, Matt and Jason determine how to pay out the funds to the various consultants and entities that worked on the projects. Consultants such as James are sometimes compensated on a deferred payment basis, meaning they are not paid until the sale closes on the project.

B.    *DEFA, Landa, and the Notes*

James and Landa had known each other since about 1988, when they began working on a water purification project on the border between the United States and Mexico. The project originally was known as the Bajagua Project, but by the time the instant litigation commenced, the name had been changed to the PURA project. James had a 27 percent ownership interest in the PURA project.

James also worked on other projects for Landa. Landa described James as his best friend. Landa, through DEFA, loaned James money several times over the years, and James signed notes for some of the loans. When James came to owe DEFA close to a million dollars, Landa's attorney recommended consolidating all the loans into one promissory note. Landa and James negotiated the terms of the note for over six months. As part of these negotiations, Landa asked James how he was going to pay the note, and James sent an e-mail listing projects he was working on from which he anticipated receiving income that he could use to repay the debt. Specifically, he wrote:

> "Enrique, the following are the projects I am involved in that will produce income to me that can be used to reduce debt.
> 2020: June, San Marcos Highlands is scheduled to close with KB Home. I will receive $100,000 to $200,000 from that sale.
> 2021: February, Eden Park is scheduled to close and I will receive $150,000 to $250,000 from that sale
> 2021 August, Melrose industrial is scheduled to clos[e] and I will receive $400,000 to $5000,000 [*sic*] from that sale
> 2021 December, I hope PURA will close and I know what I have in but do not at this time know how much I will receive
> All of these amounts are subject [to] the final sale price at closing."

4

The figures for at least the San Marcos and Melrose projects came from a discussion with Jason about the amounts James might expect to receive in deferred fees from his consultations.

At one point, the debt reached about 2.3 million. To help reduce the amount of the note, Landa agreed to lessen the debt by about a million dollars for services James had rendered on Landa's projects and as forgiveness of interest. James prepared invoices reflecting this work and sent them to Landa. Landa questioned the accuracy of the amounts but did not challenge the invoices.

Landa later sent James a draft of the note. James responded by e-mail stating, "Enrique, I will sign this, however, I must meet with my sons to explain, and Matt is on the road from a trip to [Oregon] to deliver his daughter to school and will be here in the morning. I will sign over their objections but please give me an opportunity to keep my place in the family." Matt and Jason testified that James discussed his outstanding debt to DEFA with them around this time but did not show them the 2020 note. They disagreed that James owed DEFA any money and did not believe he should use any of the fees he received in connection with his services to Dexter to pay the debt.

James signed the secured note for $1,396,449.07 on September 24, 2020. It provided, among other things, that James would pay Landa, as trustee for DEFA, "$400,000.00 at its place of business concurrently with the close of escrow of the San Marcos Highlands project." It further provided that as security for timely payments, James granted to DEFA "a first priority lien and security interest in, all proceeds, dividends, fees, commissions or other distributions that [James] or any entity affiliated with [James] or any successor entity may receive or may be entitled to receive from any person or

5

entity and related to the development, entitlement or sale of any real property, including without limitation, proceeds, dividends, fees, commissions or other distributions from the entities or related to the properties identified on Exhibit A." Exhibit A listed the following projects: San Marcos Highlands, Eden Park, Melrose Industrial, and PURA. James acknowledged at trial that he signed the 2020 note because he had agreed to pay the money to DEFA.

The next month, Landa sent a letter to the company handling the escrow for the San Marcos Highlands project demanding that $400,000 be paid from escrow to DEFA. He forwarded copies of the letter to his attorney and James but did not send copies to Dexter, Jason, or Matt. On about December 30, 2020, the date on which the San Marcos Highlands escrow was set to close, principals involved in the purchase of the project contacted Matt and Jason about calls the escrow company had received from Landa's attorney. Matt and Jason contacted James, at which point he told them about his promise to pay $400,000 to DEFA and showed them the 2020 note.

Matt and Jason explained to James that his deferred fees for the San Marcos Highlands project would be $50,000 and that he would have to come up with a way to pay the remaining $350,000 to DEFA. On December 31, 2020, the escrow company released $2,021,000 to Dexter's bank account, and Dexter subsequently paid James $50,000. James informed Landa that he did not have access to the $400,000 contemplated by the note.

Fifteen days later, James signed a convertible note (the 2021 note) acknowledging that he owed DEFA $1,482,997.37 under the previous notes, including the 2020 note. The 2021 note called for an initial payment of $400,000, followed by monthly payments of $5,000 plus 50 percent of any income received in excess of $7,500. It called for final payments of $500,000

6

on January 1, 2022, or upon sale of the PURA project, and $600,000 at the note's maturity date or upon the PURA project's sale. James secured a loan from another individual for the remaining $350,000 of the initial payment due to DEFA. He made ongoing payments toward the note but did not have funds to make the $500,000 payment and went into default.

DEFA sued James. Matt testified that he knew nothing of the 2021 note until he was added as a defendant in the lawsuit in around July 2022.

Meanwhile, James and Matt had formed Diamond Rose in September 2020 to secure an ownership interest in the Melrose Industrial project as tenants-in-common with other owners. After Diamond Rose, Matt, and Jason were all named in the instant lawsuit, Matt and Jason lost their ownership interest in the Melrose property.

C.    *The Trial Court's Final Statement of Decision (SOD)*

Following a bench trial, the court issued a proposed statement of decision. DEFA filed objections, which the court denied.

The court noted in the SOD that it was compelled to determine the appropriate weight and credibility to afford each party's testimony. It explained:

> "In assessing the parties' credibility in this case, the court, in light of some of James' testimony, was left to conclude that James' testimony was less credible than the testimony of Enrique, Matt or Jason. While James waffled throughout his testimony (both deposition and trial) with regard to whether he showed his sons the 2020 Secured Note in September 2020 and with regard to whether he had told his sons in September 2020 that he signed the 2020 Secured Note, ultimately the court found Jason's and Matt's vehement denials that they knew of the 2020 Secured Note before December 30, 2020 extremely credible."

7

The court acknowledged that James discussed his *debt* to DEFA with his sons but found he did not discuss with them his intention of signing a promissory note and did not show them the 2020 note at that time.

The court rejected DEFA's alter ego allegation, concluding DEFA had not established that there was a unity of interest and ownership between James and Dexter, Consultants Collaborative, or Diamond Rose. It found no evidence that James was an "insider" in Dexter or Diamond Rose. The court described James as an independent contractor providing services to Dexter for which he was paid "various hourly rates and under various payment paradigms, inclusive of deferred compensation agreements."

Regarding the breach of contract claim against James, the court found DEFA had met its burden of showing James failed to satisfy his obligations under the 2021 note. It assessed the appropriate damages to be $1,082,997 plus interest pursuant to paragraph 1 of the 2021 note. The court further granted in part DEFA's request for declaratory relief, although, considering the evidence presented, it limited the relief to the following:

> "a. DEFA is entitled to collect $1,082,997.00, plus interest pursuant to Paragraph I of the 2021 Convertible Note, from James Simmons;
>
> "b. DEFA shall have a secured lien on James Simmons'[s] ownership interest in PURA in an amount that does not exceed the total amount James Simmons owes to DEFA;
>
> "c. DEFA shall have a secured lien on any fees or disbursements to which James Simmons is entitled in connection with the closing of escrow on the Eden Park Project and the Melrose Industrial Project in an amount that does not exceed the total amount James Simmons owes to DEFA."

The court otherwise concluded DEFA's claim against James for breach of the implied covenant of good faith and fair dealing lacked evidentiary and

legal support.  As to its third and fourth causes of action for fraudulent conveyance and conspiracy to commit fraudulent conveyances, the court found no evidence Defendants transferred any assets belonging to James with the intent to hinder, delay, or defraud DEFA.  It likewise rejected DEFA's fraud claim, concluding there was no evidence James affirmatively represented that he had an ownership interest in the San Marcos Highlands or Eden Park projects or misrepresented his interest in the PURA project.  Although there was some evidence James misrepresented his ownership interests in the Melrose Industrial project, the court did not find DEFA had met its burden of proof on this claim.

## DISCUSSION

DEFA contends the court's findings are not supported by substantial evidence.  Thus, it was obligated to set forth in its opening brief all the material evidence on each issue, not merely those facts that support its theories.  (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1658.)  Further, it was required to fairly summarize the facts in the light most favorable to the judgment.  (*Id.* at p. 1658; see Cal. Rules of Court, rule 8.204(a)(2)(C).)  DEFA's opening brief did not comply with these conditions.

Although we could deem DEFA's failure to set out the facts in the light most favorable to the judgment as forfeiture of the issues (*Foreman & Clark*

9

*Corp. v. Fallon* (1971) 3 Cal.3d 875, 881), we have elected not to do so and have thoroughly reviewed the record.[2]

## I.

### *Alter Ego Liability*

DEFA contends the court erred by rejecting its alter ego theory because, in its view, the SOD describes and ignores a massive commingling of assets by Defendants. We disagree.

A. *Legal Principles*

"Ordinarily a corporation is considered a separate legal entity, distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations. [Citation.] The same is true of a limited liability company (LLC) and its members and managers." (*Curci Investments, LLC v. Baldwin* (2017) 14 Cal.App.5th 214, 220 (*Curci Investments*).) However, "[a] corporate identity may be disregarded—the 'corporate veil' pierced— where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation." (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 (*Sonora Diamond*).) This veil piercing is referred to as the alter ego doctrine. (*Curci Investments*, at p. 220.) "The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form

---

[2]     As an initial matter, DEFA indicates in its brief that it is challenging the court's holding that substantial evidence did not support its fraudulent conveyance claim, but nowhere in its briefing does DEFA provide argument or authority on this issue. Accordingly, we disregard it. (See *City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287 ["[W]e may disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt"].)

unjustly and in derogation of the plaintiff's interests." (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300.)

Two conditions must be met to invoke the alter ego doctrine: (1) "there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist"; and (2) "there must be an inequitable result if the acts in question are treated as those of the corporation alone." (*Sonora Diamond, supra*, 83 Cal.App.4th at p. 538.) Although no one characteristic governs, courts are instructed to examine all the circumstances, including the following factors, to determine whether the doctrine should be applied: " 'commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other.' " (*Id.* at pp. 538–539.) "Other factors which have been described in the case law include inadequate capitalization, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers." (*Id.* at p. 539.) Because the court's conclusion on alter ego liability is thus very fact-specific, we will not disturb the court's decision if it is supported by substantial evidence. (*Constellation-F, LLC v. World Trading 23, Inc.* (2020) 45 Cal.App.5th 22, 29 (*Constellation-F*).)

In this case, DEFA effectively asked the court to employ outside reverse veil piercing. This concept applies when a third party "seeks to satisfy the debt of an individual through the assets of an entity of which the individual is an insider." (*Curci Investments, supra*, 14 Cal.App.5th at p. 221.) Although some courts in other states have adopted a variant of the traditional veil piercing test that adds additional factors aimed at addressing

11

concerns unique to the reverse piercing context, particularly in cases involving corporations, this District has applied the traditional test where the entity was an LLC. (*Id.* at pp. 222–224.) Either way, it remains a very fact-driven analysis. (*Id.* at p. 224.)

B.    *Analysis*

DEFA appears to have cut and pasted its arguments regarding alter ego liability from its objections to the court's proposed statement of decision. These arguments essentially ask us to reweigh the evidence, which we cannot do.

"[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609.) "Typically, when the trier of fact determines that a party has not satisfied its burden, that party is not entitled to a 'do over' on appeal where the appellate court looks at all the evidence and arguments anew and substitutes its judgment for that of the fact finder below." (*People v. Field* (2024) 106 Cal.App.5th 132, 158.)

To the contrary, " '[i]n a case where the trier of fact has determined that the party with the burden of proof did not carry its burden and that party appeals, "it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment." [Citations.]  Instead, "where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence *compels a finding in favor of the appellant as a matter of law*." [Citation.]  Specifically, we ask "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of

12

such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " ' (*Ajaxo, Inc. v. E\*Trade Financial Corp.* (2020) 48 Cal.App.5th 129, 163–164, italics added . . . .) This is 'an onerous standard' (*id.* at p. 164) and one that is 'almost impossible' for a losing plaintiff to meet, because unless the trier of fact made specific factual findings in favor of the losing plaintiff, we presume the trier of fact concluded that 'plaintiff's evidence lacks sufficient weight and credibility to carry the burden of proof.' " (*Estes v. Eaton Corporation* (2020) 51 Cal.App.5th 636, 651 (*Estes*).) Arguments that we should simply afford greater weight to testimony the trial court discredited will not carry the day. Nonetheless, we address DEFA's arguments in turn.

1.    *Invoices*

DEFA's primary argument is that when James used invoices for the services he rendered for Landa on behalf of Dexter to reduce his personal loan obligations to DEFA, it demonstrated clear commingling of assets between the Simmons family and Dexter. It contends the court's own observation supports this conclusion, citing to its footnote that: "Interestingly, the testimony at trial was that James performed many of the services on behalf of [Landa] or DEFA as a consultant for Dexter. As a result, the monies due under these invoices, if in fact they were accurate, should have been paid to Dexter." In light of this statement, which DEFA describes as entirely accurate, it contends the court was wrong when it stated: "Indeed, both Matt and Jason further credibly testified, which testimony was confirmed by James, that they had no knowledge whether amounts due under the invoices identified as Trial Ex. 120 were used as credits against amounts James owed to DEFA." According to DEFA, the statement is incorrect because James testified to the opposite—that he

13

discussed with both of his sons the plan to use Dexter's assets to reduce his personal loan obligations and "they didn't disagree."

This argument falls short because DEFA asks us to disregard the court's weighing of the evidence and accord greater credibility to James's testimony than to that of Matt, Jason, and Landa, which again, we cannot do. "In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 640; *Kirchmeyer v. Helios Psychiatry Inc.* (2023) 89 Cal.App.5th 352, 362.)[3]

Here, it is apparent from the court's full statement that the court simply afforded greater weight to Matt and Jason's testimony that they were unaware of the credit arrangement. As the court explained:

> "Because the Invoices served as credit for James' debt the monies were never paid to Dexter, and Matt credibly testified that he never authorized payment under those invoices to be made to James instead of Dexter. Indeed, both Matt and Jason further credibly testified, which testimony was confirmed by James, that they had no knowledge whether amounts due under the invoices

_____

[3] Later in its brief, DEFA devotes an entire section to arguing that the court's almost complete rejection of James's sworn deposition testimony was contrary to the overwhelming direct and circumstantial evidence confirming the truth of his testimony. Its argument focuses on who would have more motive to lie—James or his sons. Here again, it is for the trier of fact to evaluate the witness's motives and credibility and the weight to be given to each witness's testimony. (See *Blye v. Affonso* (1960) 185 Cal.App.2d 241, 243.) DEFA has not met its burden on appeal of demonstrating that substantial evidence did not support the court's credibility determinations.

identified as Trial Ex. 120 were used as credits against amounts James owed to DEFA. All of this support the court's conclusion, as further set forth in this Decision, that Jason, Matt, Dexter, and Diamond Rose, LLC were not acting in concert with James and, in fact, engaged in no wrongful conduct toward DEFA."

This conclusion is supported by substantial evidence in the record. When asked about this issue, Matt testified as follows:

"Q. Did you agree with your father getting personal credits on his loans instead of having that revenue go to Dexter?

"A. We weren't aware of it until after the fact.

"Q. Well, how long after the fact?

"A. After this case was brought forward, and we've seen the documentation you've provided."

Jason likewise stated, "I—I didn't—I was not aware of credits for the invoices exactly. So I know . . . he negotiated credits because after—because of this lawsuit and other things afterwards."

Landa's testimony further supports the court's conclusion that Dexter did not issue these invoices. Landa explained that James had worked on two projects for him—Los Alamos and Gateway—for which he would receive deferred fees upon the finance or sale of the projects.[4] To help reduce the amount due on the note, he suggested James send him invoices for everything he had worked on for those projects even though "[t]hey were not due." As Landa explained, the Los Alamos project never closed and was "dead," and the Gateway project remained ongoing. In other words, James was not at that point entitled to payment of any deferred fees, regardless of

---

[4] He further explained, "we had that agreement with many other consultants. And it's a common practice as—Jason testified today, that some of his consultants defer some of the fees with a premium at the end."

15

whether they were to be paid directly to him or to Dexter for his work. Landa also did not contest any of the amounts in the invoices even though his accountant said, "Enrique, these are a hundred percent invented invoices." Therefore, it was reasonable for the court to credit Jason and Matt's testimony that they were not aware of the invoices, and thus not party to commingling of Dexter's assets with James's, because the fees were not presently due to be paid to anyone. This evidence also addresses DEFA's argument that it is not credible that two "experienced and successful business men" would not investigate what happened to several hundred thousand dollars of uncollected invoices. It is quite reasonable to assume they would not check on invoices they were unaware of and had not sent for payments that were not presently owed.

DEFA has not directly challenged on appeal the court's conclusion that:

> "The undisputed evidence was that James: (1) did not control the operations or business dealings of Dexter in the 2019/2020 time frame, (2) was not an officer, director, or shareholder of Dexter, (3) was not involved in decisions regarding how Dexter distributed its profits, and (4) did not have access to Dexter's bank account . . . ."

If the evidence showed James did not have authority to control Dexter's decisions or funds, and Matt and Jason did not know James had attempted to encumber earnings due to Dexter, it was reasonable for the court to conclude there was not "such a unity of interest and ownership" between Dexter, Jason, Matt, and James that their separateness ceased to exist. (*Sonora Diamond, supra*, 83 Cal.App.4th at p. 538.) Accordingly, we conclude substantial evidence supported the court's conclusion that James was not an insider at Dexter for alter ego purpose.

### 2. *Other Evidence*

According to DEFA, additional evidence supports application of the alter ego doctrine. DEFA first points to James's testimony that Dexter regularly paid his monthly home mortgage and disbursed $5,000 per month to him, which he then used to make his monthly note payments to DEFA. It also references an exhibit not included in the appellate record ostensibly showing that Dexter paid approximately $250,000 in James's personal living expenses over a two-and-a-half-year period. Given James's testimony that he never sent invoices to Dexter for his work and never had a written agreement with Dexter, DEFA contends the lack of proper documentation to support these payments proves lack of separateness and alter ego liability.

Despite DEFA's bald assertion that this evidence was "overwhelming . . . and not contradicted," DEFA does not grapple with the contradictory evidence presented at trial and relied upon by the court. DEFA's burden on appeal is to demonstrate that its evidence " ' "was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " ' " (*Estes, supra*, 51 Cal.App.5th at p. 651.) Here, substantial evidence in the record supports the court's contrary conclusion. In fact, James himself refuted the implication that Dexter paid him $5,000 per month in unearned funds. When asked if he was paid that amount whether he worked one hour or a hundred hours in a particular month, he replied, "I always bring in more money than I take."

Matt likewise testified as to the $250,000 paid to James, "yes, I'm aware of what I paid him *for his work*." (Italics added.) He went on to explain, "That number is not just pay. There are reimbursables. There are other items in there that are not just 1099 wages. [¶] . . . [¶] It's also loans."

When asked if Dexter paid James's mortgage every month, Matt responded, "we pay Mr. Simmons, or Jim, his money, and he pays his mortgage with the money he earns." Although Matt acknowledged the lack of invoices for this work, he explained:

> "[O]ur projects bill on different formats. Some are milestones. Some are hourly. And we are very aware what—this is what one of my . . . main roles in the company is, is watching what each contractor does and when they hit those points, paying them for their services."

Jason also provided testimony suggesting this unusual payment system is common in their business. When asked how subcontractors are compensated, Jason described the options as follows:

> "A. It varies per [subcontractor] company and per project. Oftentimes, they'll just get a flat rate from—from a company saying it's this amount. It's $5,000, for example. We say, okay, you get paid accordingly. Sometimes they'll say, well, I'll break it up over the five months of the project. I want to get paid a thousand each month. Say, okay, that's great. So it's negotiated on every deal a little differently. Sometimes it is hourly and tracked that way. It varies.
>
> "Q. Are there occasions where subcontractors don't know exactly what they're going to get until they get paid?
>
> "A. Yeah, on—on occasion they'll be—that's—
>
> "(Reporter clarification.)
>
> "THE WITNESS: That's mostly any time there is a deferred situation, then it will vary depending on the time frame it takes to get a project done and the amount of work they end up doing. Oftentimes, we don't know how much work a person's going to have to do on it until we get in the middle of a project. So we might be halfway through, and all of a sudden we need to start renegotiating or discussing different terms because they're spending a lot more time on it or no time."

18

On this record, we cannot say DEFA's evidence compels a finding in its favor as to alter ego liability as a matter of law. (*Estes, supra*, 51 Cal.App.5th at p. 651.)

The same is true of the other evidence DEFA presents. DEFA points to James's testimony that: (1) Consultants Collaborative has used the moniker "CCI" for decades; (2) Dexter and the Simmons family use the office space Consultants Collaborative has occupied for over 25 years; (3) Consultants Collaborative is the only name on the building's sign; (4) Consultants Collaborative and Dexter use the same phone number, the same website, and the same promotional materials, and they only reference "CCI," not Dexter; (5) numerous customer checks made payable to "CCI, Inc." have been deposited in the Dexter bank account; and (6) Dexter has benefited from the goodwill associated with using the CCI name without making any payment to Consultants Collaborative or James. As previously discussed, although these are all factors the court may and did consider in determining whether alter ego liability should apply (see *Sonora Diamond, supra*, 83 Cal.App.4th at pp. 538–539), the ultimate weighing of factors is for the trial court, and we will uphold its decision if it is supported by substantial evidence. (*Constellation-F, supra*, 45 Cal.App.5th at p. 29.)

We find such substantial evidence in the record. Jason testified that Dexter registered the fictitious business names "CCI" and "CCI Connect" (the name on its website) to notify the public that it was conducting business under these names. No evidence was presented that Consultants Collaborative ever registered the moniker "CCI." Although Matt acknowledged Dexter shared office space and a telephone number with Consultants Collaborative, he pointed out that Consultants Collaborative stopped operating as a business in around 2015. He explained that all their

19

consultants, not just James, were allowed to use the office space and could use Dexter telephone numbers and e-mail addresses during their projects. He also said Dexter had its own separate business checking account. He acknowledged that checks had come in written to Consultants Collaborative and CCI Connect but explained that they deposited them because the work was done under contracts with Dexter.[5] Jason testified that Dexter followed formal company operations: it had a valid operating agreement, held annual meetings, filed taxes, paid bills and contractors, and maintained adequate capitalization.

Ultimately, on this record, we conclude DEFA has not met its burden of showing error in the court's conclusion that DEFA failed to demonstrate that outside reverse veil piercing was warranted.

## II.

### *Whether James is "Affiliated" with Dexter*

In its opening brief, DEFA argues the court failed to decide the issue of whether James was an "affiliate" of Dexter in 2019 to 2020. As Defendants point out, the court did expressly rule on this issue, stating: "the evidence demonstrated that James was not an 'affiliate' of Dexter at any time after 2012, assuming he ever had been." Acknowledging this, DEFA changes tack in its reply brief, arguing instead that the court erred in finding that James and Dexter were not affiliated.

DEFA's primary argument in both briefs is effectively that no evidence can rebut James's sworn testimony that he was affiliated with Dexter. Had the question been whether *James* could be held liable, then his admission

---

[5] James also testified that Consultants Collaborative has not collected any revenue since 2015. He further admitted, "I don't control what Dexter does. I don't see their books. I don't have any input to their bank accounts. I don't sign checks. I don't have any access to anything they do."

20

would likely have been significant, regardless of what testimony others provided. But here, DEFA seeks to use James's admission to make *Dexter* liable for James's debts. Under these circumstances, it is not irrelevant that Jason and Matt were unaware of the notes at the time James signed them and that other credible evidence refutes James's assertion that he was affiliated with Dexter. DEFA provides no authority for the proposition that the court must afford greater weight to one witness's testimony under oath over another's, even if no objections were made when that testimony was entered. At one point, DEFA refers to James's statement as a "party admission," but this is a hearsay exception. (See Evid. Code, § 1220.) It does not impact the trier of fact's discretion to weigh credibility and decide issues of fact and law.

DEFA otherwise rehashes the same arguments it made in support of applying the alter ego doctrine. As we have already concluded substantial evidence supported the court's rejection of DEFA's alter ego arguments, we conclude DEFA has similarly failed to demonstrate the court erred in determining that James was not affiliated with Dexter.

III.

*The Court's Declaratory Judgment Language*

DEFA approves of the court's entry of a declaratory judgment but argues the language improperly limits its security interest in the collateral defined in the 2020 note and repeated in the 2021 note.

A. *Additional Facts*

In its first amended complaint, DEFA sought declaratory relief by way of its sixth cause of action. It alleged that, "[a]n actual controversy has arisen and now exists between Plaintiff on the one hand, and the Defendants on the other, concerning their respective rights and obligations related to the

21

2021 Convertible Note, and the security interests and first lien created under the 2020 Secured Note and the 2021 Convertible Note." DEFA requested "a judicial determination of its rights and obligations under the parties' written contracts."

The notes provided:

> "[James] hereby grants to [DEFA] and the assignee (if any) of [DEFA] a security interest in and to all of the following property ('Collateral') in which [James] now has or hereafter acquires any right, title or interest, wheresoever located and whether in the possession of [James] or any other person or entity, and all proceeds thereof (including but not limited to accounts, inventory, farm products, chattel paper, documents, instruments, deposit accounts and general intangibles):
>
> > "(i) Proceeds, dividends, fees, commissions or other distributions that [James] or any entity affiliated with [James] or any successor entity may receive or may be entitled to receive from any person or entity and related to the development, entitlement or sale of any real property, including without limitation, proceeds, dividends, fees, commissions or other distributions from the entities or related to the properties identified as . . ."

San Marcos Highlands, Eden Park, Melrose Industrial, and PURA.[6]

In its SOD and in the judgment, the court granted DEFA, among other things, the following declaratory relief:

> "DEFA shall have a secured lien on any fees or disbursements to which James Simmons is entitled in connection with the closing of escrow on the Eden Park Project and the Melrose Industrial Project in an amount

---

[6] Although DEFA contends the 2020 and 2021 notes contain the same language, the only collateral listed in the 2021 note is the PURA project.

22

that does not exceed the total amount James Simmons owes to DEFA."

The court further granted DEFA a secured lien on James's ownership interest in PURA, not to exceed the total amount James owes DEFA.

B.    *Legal Principles*

"Any person interested . . . under a contract . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action . . . in the superior court for a declaration of his or her rights and duties . . . including a determination of any question of construction or validity arising under the instrument or contract . . . and the court may make a binding declaration of these rights or duties . . . ."  (Code Civ. Proc., § 1060.)  The purposes of a declaratory judgment are to " ' " 'serve some practical end in quieting or stabilizing an uncertain or disputed jural relation' " ' " and to " ' " ' "liquidate doubts with respect to uncertainties or controversies which might otherwise result in subsequent litigation [citation]." ' " ' " (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 647 (*Meyer*).)  "In an action for declaratory relief, the proper function of the court is to make a full and complete declaration, disposing of all questions of rights, status or other legal relations encountered [*sic*] in construing the instrument before it."  (*American Enterprise, Inc. v. Van Winkle* (1952) 39 Cal.2d 210, 219 (*American Enterprise*).)

" 'In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo.  [Citation.]  We apply a substantial evidence standard of review to the trial court's findings of fact. [Citation.]' " (*Protect Our Neighborhoods v. City of Palm Springs* (2022) 73 Cal.App.5th 667, 676.)

23

C.      *Analysis*

DEFA expressly asked the court to determine the parties' rights and obligations under the notes, and that is what the court did. Because DEFA does not agree with the court's determination, it now argues the court could not rewrite valid, unambiguous contracts. But again, that is not what the court did here. The purpose of a declaratory judgment is to provide a practical resolution of uncertainties and disputes (*Meyer, supra*, 45 Cal.4th at p. 647) and to "dispos[e] of all questions of rights, status or other legal relations encountered [*sic*] in construing the instrument before it." (*American Enterprise, supra*, 39 Cal.2d at p. 219.) In this case, the court made a determination, supported by substantial evidence, that DEFA had not met its burden of proving that James was affiliated with, or the alter ego of, Dexter. Based on that conclusion, it declared what rights DEFA had under the notes going forward so as to clarify the parties' respective rights and avoid future litigation.

In DEFA's view, the only option the court had in granting declaratory relief was "to interpret and enforce the parties' written contracts as written." We do not disagree that " '[u]nder statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation . . . [and that] [s]uch intent is to be inferred, if possible, solely from the written provisions of the contract.' " (*Coral Farms, L.P. v. Mahony* (2021) 63 Cal.App.5th 719, 727.) However, DEFA did not ask the court to simply construe the terms of the contract or determine the intention of the parties; it asked the court to determine their rights and obligations. Even if it was Landa's understanding that the notes could be enforced directly against Dexter, or James's intention that Dexter should pay his debts, that did not automatically bind Dexter, which was not a party to the contracts.

24

The court was required to go beyond mere contract interpretation to determine whether Dexter could be held accountable as a matter of law either as an affiliate or under an outside, reverse veil piercing theory.

In so doing, it was required to consider what language in the notes was enforceable upon the parties before it. For instance, DEFA contends it was improper for the court to omit "proceeds, dividends, . . . commissions or other distributions" from the declaratory judgment because those additional forms of collateral were listed in the notes. Yet no evidence was presented that James expected to receive these other forms of income from any of the listed projects. And, even if he were to receive income from the Eden Park or Melrose Industrial projects that was not considered payment of "fees," he has not explained why said income would not fall under the court's broader rubric of "disbursements." The court may only declare what has been proven by the evidence.

Likewise, DEFA suggests the court could not remove the language regarding affiliates or successor entities because the only question litigated in the underlying trial was whether James was affiliated with Dexter. However, " '[t]he fundamental basis of declaratory relief is the existence of an *actual, present controversy* over a proper subject.' " (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79.) "The 'actual controversy' referred to in this statute is one which admits of definitive and conclusive relief by judgment within the field of judicial administration, as distinguished from an advisory opinion upon a particular or hypothetical state of facts." (*Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 117.) The court only had authority to decide the dispute before it between the parties before it and could not render advisory opinions regarding what rights DEFA might have if James claimed affiliations with nonparties or successor entities.

25

Furthermore, issuing a declaratory judgment that included language not relevant to the matter at hand would only invite future litigation, which would contravene the purpose of providing declaratory relief.

Accordingly, we find no error in the court's declaratory judgment language.

IV.

*Sanctions*

Jason, Matt, Dexter, and Diamond Rose (collectively, the "Moving Parties") move for sanctions against DEFA and its attorney of record, Michael L. Kirby, for filing a frivolous appeal in this matter. They contend DEFA and counsel have failed to even address the requirements of the substantial evidence standard of review in this appeal. Additionally, the Moving Parties argue they were brought into the case to harass them and that in bringing this appeal, DEFA and counsel continue to hamper the Moving Parties' ability to conduct business. Finally, they submit that DEFA and counsel have delayed resolution of the case at every turn.

"Whether to impose appellate sanctions is a matter within our discretion." (*Citizens for Amending Proposition L v. City of Pomona* (2018) 28 Cal.App.5th 1159, 1194; see also Cal. Rules of Court, rule 8.276(a)(1) ["On motion of a party or its own motion, a Court of Appeal may impose sanctions . . . on a party or an attorney for . . . [¶] [t]aking a frivolous appeal or appealing solely to cause delay"]; Civ. Proc., § 907.) "[A]n appeal should be held to be frivolous only when it is prosecuted for an improper motive—to harass the respondent or delay the effect of an adverse judgment—or when it indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650.) However, our

high court has advised that the definition of frivolousness "must be read so as to avoid a serious chilling effect on the assertion of litigants' rights on appeal" and that "[c]ounsel and their clients have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win on appeal." (*Ibid.*)

This motion presents a close call. As discussed *ante*, DEFA presented an incomplete and self-serving version of events at trial. It also provided a skewed summary of the SOD. The Moving Parties cite several instances of delay, and it is apparent counsel did not use the additional time to craft a brief that reflected a careful reading of the court's order or an effective adherence to the appropriate standard of review. However, after our thorough review of the record, we cannot say DEFA's appeal was so totally and completely devoid of merit as to be objectively frivolous. (See *Malek Media Group LLC v. AXQG Corp.* (2020) 58 Cal.App.5th 817, 834.) We therefore deny the Moving Parties' motion for monetary sanctions.

## DISPOSITION

The judgment is affirmed. Defendants are entitled to their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

RUBIN, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.

27